**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

CITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

THE WESTERN UNION COMPANY,
HIKMET ERSEK and
SCOTT T. SCHEIRMAN,

      Defendants.

---

**PLAINTIFF'S CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS**

---

Plaintiff City of Taylor Police and Fire Retirement System, ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of The Western Union Company's ("Western Union") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed reports and information about the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased the common stock of The Western Union Company ("Western Union" or the "Company") between February 7, 2012 and October 30, 2012, inclusive (the "Class Period"), against Western Union and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

3.      Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

4.      Western Union's principal executive offices are located at 12500 East Belford Avenue, Englewood, Colorado 80112.

5.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff City of Taylor Police and Fire Retirement System purchased Western Union common stock as described in the attached certification and was damaged thereby.

7.      Defendant Western Union is engaged in money movement and payment services. The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WU," and as of October 31, 2012, Western Union had approximately 596.6 million shares issued and outstanding.

8.      Defendant Hikmet Ersek ("Ersek") is, and at all relevant times was, Chief Executive Officer ("CEO"), President and a director of Western Union.

9.      Defendant Scott T. Scheirman ("Scheirman") is, and at all relevant times was, Chief Financial Officer ("CFO"), Executive Vice President and a director of Western Union.  During the Class Period, defendant Scheirman sold 26,916 shares of his Western Union stock for proceeds of over $481,000.

10.     The defendants named above in ¶¶8-9 are referred to herein as the "Individual Defendants."

11.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Western Union's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases

- 2 -

alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with

the Company, and their access to material non-public information available to them, but not to the

public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed

to and were being concealed from the public and that the positive representations being made were

then materially false and misleading.  The Individual Defendants are liable for the false statements

pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

12.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose

adverse facts known to them about Western Union.  Defendants' fraudulent scheme and course of

business that operated as a fraud or deceit on purchasers of Western Union common stock was a

success, as it: (i) deceived the investing public regarding Western Union's prospects and business;

(ii) artificially inflated the price of Western Union common stock; (iii) caused plaintiff and other

members of the Class to purchase Western Union common stock at inflated prices; and (iv)

permitted defendant Scheirman to sell hundreds of thousands of dollars of his Western Union stock

at artificially inflated prices.

## BACKGROUND

13.     Defendant Western Union provides money movement and payment services

worldwide.  The Company operates in three business segments: Consumer-to-Consumer ("C2C"),

Consumer-to-Business ("C2B") and Business Solutions.  The C2C segment offers money transfer

services, including walk-in money transfer, online money transfer, account based money transfer,

and mobile money transfer through a network of third-party agents using multi-currency and real-

time money transfer processing systems.  The C2B segment provides services to consumers to allow them to make one-time or recurring payments to other businesses.  Additionally, the Company provides money orders for making purchases, paying bills, and as an alternative to checks; and prepaid cards that allow consumers to load money or receive a direct deposit onto the card for use. The Business Solutions segment provides business-to-business payment solutions for cross-border and cross-currency transactions.

14.     Through its global network of more than 500,000 outside agents in 200 countries, Western Union is the largest money transfer company in the world, holding a nearly 18% market share in the international remittance market.  The C2C segment is Western Union's key operating division and operates via three distinct brands: the Western Union brand, the Vigo brand and the Orlandi Valuta brand.  The Vigo and Orlandi Valuta brands operate extensively in Mexico and Latin America.  Individual money transfers from one consumer to another is the core of Western Union's business and accounted for 84% of the Company's revenue for 2011.  Western Union generates revenue on its C2C transactions by charging (1) a transfer fee and (2) a currency exchange fee, if applicable.

15.     Western Union's C2C segment primarily targets consumers who are unbanked or underserved by financial institutions, mainly consisting of migrants who need to send money back to their friends and families in their home countries.  These funds, called remittances, are mostly spent on housing, food, clothing and durable consumer goods.  Remittances sent from immigrants in wealthier countries are a staple source of income for many developing countries, including Mexico, where they are the second largest foreign source of income after oil exports.

16.     The United States is the largest send-side location in the world with US outbound payments accounting for 20% of Western Union's total revenue, with the largest number of remittances going to Mexico and the Philippines.

17.     Many of Western Union's customers are unlikely to have access to traditional banking institutions as they lack the money and/or the proper documentation to open a bank account. Moreover, the recipients of the funds are often located in rural villages in less developed countries. Accordingly, immigrants are likely to turn to remittance companies such as Western Union as the only secure option for sending money.  As a result, money transfer companies, such as Western Union, are able to charge more for their services over traditional banks.  Wire transfer customers are routinely charged a fee of more than 10% of the total value of the transaction and in some cases even more than 20%.

18.     Western Union is the dominant force in the remittance industry and as such, has long enjoyed the highest profit margins in the industry, in some instances charging a 50% premium over rivals.  Much of Western Union's success has been due to its ability to require many of its agents to operate under an exclusivity agreement, including agents operating under the Vigo and the Orlandi Valuta brands.  In addition, Western Union often maintained a lower dollar threshold at which point consumers would be required to show identification in order to conduct a transaction over its competitors, thus providing the sender with a higher degree of anonymity.  Customers were willing to pay the higher fees for more anonymity and a significantly larger network of locations to send and receive funds.

19.     Given Western Union's business involves sending money across country borders, compliance with anti-money laundering and other regulations is a significant concern for the

Company.  Within the United States, Western Union is regulated by various state and federal laws, including the USA Patriot Act and the Bank Secrecy Act.  Store agents are required to maintain accurate records and file reports of suspicious activity, such as documenting efforts to split a single payment into smaller transactions or identifying large withdrawals.

20.     Stringent money laundering controls at traditional banking institutions have largely shut drug dealers and human traffickers out of using the formal financial system, making wire transfer companies vulnerable to being exploited.  Wire transfer companies have been particularly susceptible in the area of human trafficking as many of the transactions involve small dollar amounts and the transactions can be made from various locations and completed very quickly.  The transactions can further be done on a virtually anonymous basis and in certain locations, even if identification is required, individual clerks have been corrupted to accept almost any kind of identification.

### THE SOUTHWEST BORDER AGREEMENT

21.     As Western Union is the most dominant player in the international remittance company and enjoys the highest profit margins, it has long been the target of investigations by different state and federal agencies.  The state of Arizona initiated an investigation against Western Union in 2001, alleging that the Company was not reporting suspicious activity, as it was required to do.  In written testimony dated March 17, 2009, to the Senate Judiciary Committee, subcommittee on Crimes and Drugs and the Senate Caucus on International Narcotics Control, the former Attorney General for the state of Arizona, Terry Goddard discussed the crucial role of wire transfer companies in human trafficking and Western Union's role in the process:

> Organized, cross-border crime between Mexico and Arizona is concentrated on trafficking in illegal drugs, humans and weapons.  Each of these activities involves

the movement of money. ***Human trafficking in particular requires rapid movement of money among people who have no ongoing relationship. Western Union is by far the largest provider of illicit money-movement services, so it is the source of valuable information about illicit money movements and has been the focus of interdiction efforts aimed at criminal proceeds in transit***.

Human smuggling organizations, also known as "coyotes," are well-organized and violent. Their human "cargo" are often victimized, held for ransom or worse. In one typical case, 20 undocumented immigrants were taken by six smugglers to a Phoenix drop house. Soon after arriving, the immigrants were informed that the price for bringing them into Arizona would be twice as high as they had been told. When one member of the group objected, the coyotes walked him into another room, shot and killed him.

Human smuggling is not just violent, it is highly profitable. ***Hundreds of millions of dollars have been wire transferred into Arizona to pay for smuggling human beings***. To cut down on coyote activities, the Arizona Attorney General's Office has for several years used "sweeping" warrants to screen the wire transfers of cash that pay coyotes for smuggling people into Arizona and intercept the most suspicious.

Intercepting wire transfers of criminal proceeds has proven an effective tool. Between 2003 and 2007, my Office seized more than $17 million in wire payments and arrested more than 100 smugglers. Every effort has been made to focus the warrants on activity known to be consistent with human smuggling based on a variety of identifying factors. Any legitimate cash transfers detained in the process were promptly returned, usually within 24 hours. On investigation, less than 10 percent of intercepted transfers over those years turned out to be legitimate.

Our success in seizing smuggling payments sent to Arizona dramatically reduced the volume of wire transfers into Arizona by hundreds of millions of dollars. The coyote organization that committed the Phoenix drop house murder in the example above, like many other such organizations, began to route its wire transfer payments to Sonora in northern Mexico. In response to this change in coyote tactics, we targeted 26 wire transfer locations on the Mexican side of the border. Western Union, the nation's dominant wire transfer company, went to court to stop our efforts. The Arizona Court of Appeals upheld our methods. The matter is still in litigation.

Our seizure warrants are similar to court-ordered wiretaps. Our warrants do temporarily detain some legitimate transfers, in the same way wiretaps sometimes record non-criminal conversations. Courts have authorized both seizure warrants and wiretaps when presented with evidence of reasonable probability of criminal activity and when every effort is made to minimize the impact on innocent people. That is exactly what my Office has done in this program.

With Arizona the Nation's leading gateway for human trafficking, I will continue to use all legal means available to deter and prosecute human smugglers. Seizure warrants have proven to be the most effective weapon in the fight. ***However, even though wire transfers are the coyotes' payment method of choice, Western Union still refuses to comply with subpoenas for vital data. I plan to use every legal means to force the compliance of money transmitters and stop Western Union and other money transmitters from doing business with these brutal criminals***.[1]

22.     Ultimately, on February 11, 2010, Western Union entered into a settlement agreement (the "Southwest Border Agreement" or the "Agreement") with the state of Arizona to extinguish the nearly decades long investigation concerning Western Union's inability to prevent its services from being utilized to launder money or to facilitate other criminal activity. California, New Mexico and Texas signed onto the agreement as well. The purpose of the Southwest Border Agreement was to crack down on illegal money laundering by enhancing and better coordinating investigations and prosecution of money laundering between the states along the US and Mexican border.

23.     The Southwest Border Agreement established new protocols for sharing wire transfer information, whereby Western Union would grant the states access to its transactional data so investigators could track trends in the flow of money transfers and look for suspicious activity. According to the Company's Current Report on Form 8-K filed with the SEC on February 12, 2010, the Southwest Board Agreement "resolve[d] all outstanding legal issues and claims with the State, and provide[d] that Western Union [would] reimburse the State ***up to $21 million*** for certain of its costs associated with this matter and pay ***up to $50 million*** to fund a multi-state not-for-profit organization promoting safety and security along the U.S. and Mexico border." According to the Form 8-K, "Western Union accrued for this contingency in the third quarter of 2009."

---

[1]     All emphasis added unless otherwise noted.

24.     Additionally, however, "as part of the Settlement Agreement, Western Union expect[ed] to make certain **investments in its compliance programs along the U.S. and Mexico border and to engage a monitor of that program**, which [was then] expected to cost **up to $23 million over the next several years**." The Company's Form 8-K stated that "[t]hese amounts [would] be **expensed as incurred** and **were included in Western Union's 2010 outlook** provided in its fourth quarter 2009 earnings announcement released on February 3, 2010." According to the Company's annual report to shareholders filed with the SEC on Form 10-K a few days later on February 25, 2011, "[t]he costs of the investments and the monitor [were then] expected to reach **up to $23 million over the period from signing to 2013**."

25.     In accordance with its obligations under the Agreement, Western Union executed changes to its business model and compliance practices in its Mexican operations. In the third quarter of 2012 (ended September 30, 2012), the Company implemented a series of new requirements for its Mexican agents. The agents were required to meet the new threshold requirements in order to continue being a member of the Western Union franchise. The changes to the Company's compliance program, included the following:

- revising its agreements with its Mexican agents in order to increase the Company's ability to oversee the compliance of its agents and subagents;

- reducing the thresholds at which consumers are required to provide identification for transactions generated from the states along the border between the US and Mexico; and

- migrating its three different brands (Western Union, Vigo and Orlandi Valuta) onto a common database and to a standard point of sale system. Prior to the systems convergence, the Company maintained separate databases with customer information for each of its brands and further utilized different point of sale systems. In order to enhance Western Union's real-time transaction visibility, the Company transitioned the Vigo and Orlandi Valuta's systems onto the Western Union platform.

26.     In addition to the Southwest Border Agreement, Western Union's regulatory environment was further impacted by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act").  The Dodd-Frank Act was signed into law on July 21, 2010 in the wake of the 2008 financial crisis.  The Dodd-Frank Act established the Consumer Financial Protection Bureau (the "CFPB"), a federal agency that is responsible for regulating consumer protection with regards to financial products and services in the U.S.  In January 2012, the CFPB enacted new federal rules governing remittances.  In order to comply with the new rules, money transfer providers were required to modify certain business practices, service offerings and/or procedures and adopt new comprehensive disclosure requirements by February 2013.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

27.     The Class Period commences on February 7, 2012.  On that date, Western Union issued a press release reporting its 2011 full-year and fourth-quarter earnings results.  The Company reported net income of $452.3 million, or $0.73 diluted earnings per share ("EPS:), and revenue of $1.4 billion for the fourth quarter ending December 31, 2011.  Further, the Company reported net income of $1.165 billion, or $1.84 diluted EPS, and revenue of $5.5 billion for the full year ended December 31, 2011.  Significantly, the Company provided its outlook for 2012, stating it was then on track to achieve constant currency revenue growth in the range of 6% to 8% and C2C constant currency revenue trends to be similar to the fourth quarter of 2011.  The Company also forecast EPS in the range of $1.65 to $1.70 per share for fiscal 2012.  The release stated, in pertinent part, as follows:

> Western Union President and Chief Executive Officer Hikmet Ersek commented, "We realized many accomplishments in 2011.  We exceeded our initial outlook for earnings per share, and delivered our highest full year revenue growth rate since

2008. Each of our consumer-to-consumer regions grew, with strong performance in electronic channels. . . ."

\*        \*        \*

Ersek added, "In 2012 our focus is on execution against the strategic roadmaps. While there are some near-term market challenges in parts of the world, the long-term opportunities for revenue growth and margin expansion are strong. . . ."

28.    After releasing its fourth quarter and full-year 2011 results on February 7, 2012, Western Union hosted a conference call for analysts, media representatives and investors.  During the conference call, defendants Scheirman and Ersek made statements about the Company's compliance procedures, stating, in pertinent part, as follows:

[SCHEIRMAN:]  Turning to the Americas region, revenue increased 3% on steady transaction growth of 6%.  Although not as strong as third quarter, domestic money transfers continues to have solid momentum, with revenue growth of 7%, on transaction growth of 11% in the quarter.  Mexico revenue declined 1%, while transactions increased 1% in the quarter.  Our Mexico business continues to be affected by ongoing compliance procedures, related to our Southwest border agreements.  In 2012, we will be evolving our business model and practices related to Mexico.  We're in the process of renewing agent agreements, and changing how we operate in Mexico, including further compliance-related changes.  As a result of these factors, we expect our Mexico business to decline in 2012, as we modify the business.  US outbound continued to grow, with growth rates, increasing slightly, relative to the third quarter.  For the year, the Americas operating margin was 28.5%, an increase of 30 basis points from the prior year.

\*        \*        \*

Now I'd like to review our outlook for 2012.  In general, we are anticipating a more challenging economic situation this year.  We saw some slow downs in our C2C business in the fourth quarter of 2011, and expect similar growth rates in 2012.  Our outlook assumes softness in Europe.  In the Americas, we expect our US outbound and domestic money transfer businesses to remain solid, but we are anticipating declines in Mexico, as we evolve our business model and compliance practices.

\*        \*        \*

[ERSEK:]  . . . [I]f you look at our Mexico business, it's a little bit affected by ongoing compliance procedure, which we are changing, especially from southwest [of] the border.  As you recall we had an agree to 2009, to work with an independent

- 11 -

monitor on our compliance activities.  And that we see that some of the activity has been impacted our business.  And we also are looking at 2012, of our model, our practices in Mexico.  We are in the process of reviewing some agent agreement, and changing our operating model, [].  In Mexico, we are going to upgrade our compliance-related changes.  We are going to be more – we really want to be the industry standard, and the highest standard of industry, I think we really want to be the highest there.  So I believe that we have the right approach there.  And just to put the things in perspective, as you know, none of our business, Mexico is not larger than 6% in 2011 of our business, right, so –

*     *     *

Robert Napoli – William Blair & Company [ANALYST:]  And then just on your growth rate, I mean do you think your losing some market share now? I mean, the World Bank is looking for – I think upper mid-single digit transaction growth.  I mean we saw MoneyGram report mid double-digit, like near, I think 13% transaction growth.  I mean are some of these issues in Mexico and Italy and Russia, are you currently losing market share, do you think?

[ERSEK:]  We believe, in the cross-border money transfer, we gained market share.  We compare, as you know Bob, usually with [IETA] numbers, we believed we gain market share.  We do have as I mentioned before, in some countries like Russia, or southern Europe, some challenges.  But I would say that our belief is gaining market share, and we believe we have gained market share in 2011.

29.     On February 24, 2012, Western Union filed its annual financial report on Form 10-K with the SEC for the period ended December 31, 2011, maintaining in four separate places in the Form 10-K that the "costs of the investments in the Company's [compliance] programs and for the monitor [were then still] expected to reach **_up to $23.0 million_** over the period from signing to 2013."  The Form 10-K was signed by defendants Ersek and Scheirman, among others.

30.     On March 13, 2012, Western Union attended a Credit Suisse Global Services Conference for analysts, media representatives and investors.  During their presentation, defendant Scheirman made positive statements about the Company's business, stating, in pertinent part, as follows:

- 12 -

[SCHEIRMAN:] . . . [W]e are very confident in the core C2C business model. And it might be helpful to share a little bit of our strategies and where we're heading in this area. But clearly if you just look over the last 10 years and using I-80 as our source, that every year we've continued to gain market share, each of the years over the last 10 years. And today our share stands at about 18%. And we believe we have opportunities to continue to grow that share.

\*       \*       \*

Credit Suisse [ANALYST:] So not to put you on the spot, but do you think it's a 5% growth over a long period of time, is it – can you grow faster, can you accelerate the growth?

[SCHEIRMAN:] Clearly, our objective is we want to grow faster, gain market share at an accelerated pace, although we don't give long-term guidance for our objectives. But what I would point you towards, Jim, is I-80, if you just look at near term, 2011, 2012, they estimate the cross-border remittance market is growing in that 5% range. We clearly feel like there's opportunities to continue to gain share at an increased pace as we move forward. So, again, no long-term objectives as far as growth rates, but we feel like very much the growth story is intact in the core business.

\*       \*       \*

Really, what we've seen over the years, go back five or 10 years, a lot of competition, many competitors in the marketplace. And today we only stand at about an 18% share. We do believe our brand, our agent network of 485,000 locations are really competitive strengths for us, along with our compliance programs.

But specifically when it gets to pricing what we've seen there, we manage our business in roughly 16,000 corridors, and anytime we adjust pricing it's really an eye to gain market share and to do the things that, if you will, drive the strongest revenue and profit growth on a long-term basis. And a few data points, if you look at 2011 our prices were down about 1%. If you fast forward that to the outlook we gave in February, about a month ago as part of our earnings conference, we see pricing being down 1% to 2%, so similar to what we saw in 2011.

But clearly what we feel with the combination of building our brand, evolving our product set, marketing through our loyalty program, and then some pricing adjustments here and there, we can continue to gain share as we move forward.

31.     On April 24, 2012, Western Union issued a press release reporting its first quarter

2012 earnings results. The Company reported net income of $247.3 million, or $0.40 diluted EPS,

and revenue of $1.4 billion for the quarter ending March 31, 2012.  Significantly, the Company

maintained its fiscal 2012 outlook provided on February 7, 2012.  The release stated, in pertinent

part, as follows:

> Western Union President and Chief Executive Officer Hikmet Ersek commented,
> "Overall, we started off the year in line with our outlook.  Our Consumer-to-
> Consumer segment growth accelerated compared to the fourth quarter, as strength in
> North America and the Middle East and Africa offset some expected softness in the
> Europe and CIS region.  We further expanded our global network, including
> increasing our U.S. banking and European retail presence, and in April we reached
> 500,000 Agent locations across the world."

32.     After releasing its first quarter 2012 results on April 24, 2012, Western Union hosted

a conference call for analysts, media representatives and investors.  During the conference call,

defendants Scheirman and Ersek made statements about the Company's compliance procedures,

stating, in pertinent part, as follows:

> [SCHEIRMAN:]  Turning to North America, the region's revenues increased 5%
> compared to 2% last quarter.  US outbound in Canada strengthened while domestic
> money transfer continues to have solid momentum with revenue growth of 9% on
> transaction growth of 12% in the quarter.  Mexico improved from last quarter with
> both revenue and transactions increasing 3% in the quarter.  As we mentioned in
> February, we are still determining and implementing changes to our compliance-
> related practices in Mexico.  Although we still expect to see some negative impact on
> the Vigo and Orlandi Valuta brands as we evolve our business model and
> compliance-related practices throughout the year, our Western Union brand is
> performing well.

*     *     *

> [ANALYST:]  Can you just quickly update us on the compliance situation in
> Mexico?  How that is progressing and by when do you expect to be in some
> compliance?

> [ERSEK:]  Yes, I think as we mentioned in our February earnings call, we have been
> working with the appointed external monitor very close to determine and appreciate
> changes, which we have outlined in our agreement and improvements about anti-
> money laundering oversight along all the border.  I think we did do some changes
> last year on the Vigo and on Orlandi Valuta brands and also on our brands ID

threshold changes, which have impacted our high principal transfers, which we still see it. Currently, we are also investing on the new technology changes and we have other many projects on the way. We believe that these changes have affected our principal and market share in 2012, but we also believe that these changes are needed. These changes are happening and we are going to be, as an industry leader, we're implementing the changes and that will also impact all the industry long-term.

33.     On May 1, 2012, Western Union filed its quarterly financial report on Form 10-Q

with the SEC for the period ended March 31, 2012, maintaining that the "costs of the investments in

the Company's [compliance] programs and for the monitor [were still then] expected to reach **up to**

**$23.0 million** over the period from signing to 2013." The Form 10-Q was signed by Defendants

Ersek and Scheirman.

34.     On May 9, 2012, Western Union hosted a Western Union Co. Investor Day

conference call for analysts, media representatives and investors. During their presentation,

Defendants Ersek and Scheirman made positive statements about the Company's business, stating, in

pertinent part, as follows:

[ERSEK:]     As you know, the remittance market is growing. It's a growing market. The need for migration despite some current political challenges is a fact. We believe the demographics in many countries and the economic development will support worldwide migration and the growth of the remittances.

After a brief dip in financial crisis in 2009, the remittance market is gradually returning to growth, and we believe the long-term outlook for the market is better than the current environment. As the global economies return to stronger growth and employment over time, the remittance market should accelerate.

At Western Union, we are very focused on growing our market share over the long term regardless on the economic environment. And we have two main drivers for that. The first one is adding further network, adding locations, expanding our network. And the second one is increasing retention through better customer experience at the point of sale.

*          *          *

- 15 -

We have increased our agent locations from 120,000 locations to 500,000 locations in 10 years. In the same time, we increased our market share from 7% to 17% last year, expanding our network adds growth and profits.

*       *       *

[SCHEIRMAN:] Let me first start with the total shareholder return model and give you an outline and then jump into some more details. It first starts with revenue growth. And as Hikmet mentioned, we believe we've got opportunities over the next several years to accelerate the pace of revenue growth as we move forward. Every day we think about how do we grow the top line, how do we gain market share. And as you may recall from the April 24th earnings release for 2012, we shared with you that our outlook for constant currency revenue growth on an organic basis would be in the range of 2% to 4%. But for the next several years, we believe we have opportunities to accelerate that. And I'll touch upon that in a few minutes.

And with that accelerated revenue growth, we believe we can also drive margin expansion over the next several years. Again, on April 24th, we shared with you our margin outlook for 2012 at roughly 26% margins excluding integration costs and that's, if you will, consistent with 2011 ex-restructuring cost.

But as we look forward, and we drive growth and we optimize our operating structure, our operating expenses, over the next several years we will have the business model, the management intent and the ability to drive margin expansion.

35.     On June 12, 2012, Western Union attended a William Blair and Co LLC Growth Stock Conference call for analysts, media representatives and investors. During their presentation, Defendant Ersek made positive statements about the Company's business, stating, in pertinent part, as follows:

[ERSEK:] Before I discuss about our future strategies, let me talk about the core strengths of Western Union, why this company is so – what the core strengths are and, as Bob mentioned before, why the Company has this strength to be so successful on the market. Our core strengths are four areas, big four areas. First one is the global network. The second one is the strong brand awareness. The third one is the global organization and the resources that we have. And the fourth one is the regulatory and anti-money-laundering capabilities of Western Union. All this combination gives us a unique opportunity and unique fundamentals for Western Union. And it's really – in the middle we put always the customer and build around that capabilities our business.

*       *       *

One of our very strong competitive advantage is our regulatory environment, our regulatory and anti-money-laundering competency capabilities. It scares to death the competition to enter this market, the regulatory environment. And I always say – I know it's sometimes tough, but I always say it's good that the regulatory environment, that we as Western Union have these capabilities to serve the customers and give the trust to the customers they believe at Western Union.

And we spend about $60 million yearly on the anti-money-laundering activities. We have about 600 employees really looking after the regulatory environment on the day to day. And don't forget, we are not only regulated in the US or in the UK; we are regulated in 200 countries. We do have different regulatory environment in 200 countries and Western Union has the competency to serve the customers. And it's not easy to get a money transfer license in Tajikistan. It's not easy to have a money license in Gabon and Brazil or other states I'm talking about. So it's a competitive advantage for Western Union and we are very proud of that.

*     *     *

. . . There is competition and there will be competition. Thanks God they keep us fit. There will be competition. But they are mainly corridor-to-corridor competitors. They're focusing on certain corridor and they are competing with us with pricing, with everything and we – our response has been always good to that. Our pricing, if you look at the last few years, has been investment in between 1% and 3%. And not that we had to go down with our pricing significantly to compete against that, the (inaudible) of that, why we can do that, because you're in 200 countries. Sometimes competing with our corridor specials, you go with the prices minus 10% [sometimes down.] But in the overall portfolio it doesn't hurt our shareholder value or margins. So that has been something.

36.     On July 24, 2012, Western Union issued a press release announcing its second quarter 2012 financial results. The Company reported net income of $271.2 million, or $0.44 diluted EPS, and revenue of $1.4 billion for the quarter ending June 30, 2012. Significantly, the Company again maintained its fiscal 2012 revenue outlook provided on February 7, 2013, but **raised its EPS outlook** from a range of $1.65 to $1.70 per share to a range of $1.68 to $1.72 per share. The Company did reduce its operating margin "increased compliance related costs," but did not explain what or how much those costs entailed. The release also emphasized, in pertinent part, as follows:

Western Union President and Chief Executive Officer Hikmet Ersek commented, *"Overall we are on track for our full year financial outlook.* In the quarter, our core consumer money transfer business, which represents over 80% of Company revenue, delivered *solid 3% constant currency growth with consistent margins*. The Middle East and Africa, Asia Pacific, and Latin America regions and on-line money transfer performed well, more than offsetting the impact of consumer slowdowns in Southern Europe and some expected softness in certain countries. *The global diversification of our portfolio and resiliency of our consumers continue to drive revenue growth and strong cash flow, even in a challenging economic environment*."

37.     After releasing its second quarter 2012 results on July 24, 2012, Western Union hosted a conference call for analysts, media representatives and investors. During the conference call, defendants Scheirman and Ersek made statements about the Company's compliance procedures, stating, in pertinent part, as follows:

[SCHEIRMAN:] Mexico revenue declined 7% and transactions decreased 5% in the quarter. As you recall, we anticipated revenue climbs and share losses in Mexico this year, as we implement changes to our compliance related practices and business model.

                    *       *       *

[ERSEK:] Sure, let me start with some color, more color on North America, Bob. I think, the Mexico business, North America outbound to Mexico business has been meeting our expectations. We were expecting some slow down due to our, some changes we implemented in the southwest border area. Don't forget that it's about 25% of our revenue is from the US outbound to Mexico is coming from the southwest border area. 25%, so it has slowed down.

We put some higher restrictions there, we put some higher requirement for customers and I think it impacted short term our business. Long term we believe that we're going to be upgrading and we're going to set some industry standards here. That has been some Mexico.

                    *       *       *

[SCHEIRMAN:] The only thing I would add that the third component of the North America business is US outbound and it continued to experience growth in the second quarter. Not quite as strong as the first quarter, but it was still growing. Just to reiterate with Mexico, it's really what we expected to have some challenges in

- 18 -

2012.  But as we work through evolving the business model and so forth, we believe that will put us in a much stronger position on a long-term basis with Mexico.

38.     On August 2, 2012, Western Union filed its quarterly financial report on Form 10-Q with the SEC for the period ended June 30, 2012, once again maintaining that the "costs of the investments in the Company's [compliance] programs and for the monitor *[were still then] expected to reach up to $23.0 million* over the period from signing to 2013."  The August 2nd Form 10-Q disclosed for the first time that "actual costs incurred for these programs *will likely exceed this amount*," yet concealing that the costs would *definitely* exceed the original $23 million – *by nearly double* – and that the Company was not on track to complete its performance under the terms of the Southwest Border Agreement by 2013.  The Form 10-Q was signed by Defendants Ersek and Scheirman.

39.     Defendants' statements referenced above in ¶¶ 27-38 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants, or recklessly disregarded by them:

(a)     that Western Union was experiencing difficulties complying with its increased compliance duties required by the Southwest Border Agreement, that the State of Arizona was not satisfied with its efforts, and that as a result, the Company was not on track to complete its obligations under the Southwest Border Agreement by July 2013;

(b)     that Western Union was spending significantly more than forecast on its efforts to satisfy the compliance and monitoring program.  Specifically, during the Class Period, Defendants represented that the "[t]he costs of the investments in [compliance] programs and for the monitor [being] expected to reach *up to $23 million over the period from signing to 2013*."  Western Union, however, actually spent *over $40 million*;

- 19 -

(c)     that Western Union had downplayed the impact that changes in its compliance and regulatory environment were having on the Company's operations during the Class Period, including its operations in Mexico and Latin America, which would require that in the process of implementing the new system requirements in the third quarter of 2012, the Company would be forced to close 40% of its Mexican locations operating under the Vigo brand as they would be unable to meet the new heightened standards;

(d)     that in addition to the monitoring required to address the money laundering that occurred through Western Union's C2C money transfers in the Southwest Border Area, the scope of the monitor's review was being expanded to include Western Union's Business Solutions segment, exponentially increasing the costs of compliance and the adverse effects on Western Union's Business Solutions segment;

(e)     that Western Union's ability to charge a premium for its core money transfer product was under competitive pricing pressure during the Class Period such that due to intense competition in certain of the Company's key corridors, where Western Union's service fees were up to 50% to 60% more expensive than its closest competitors, such that the Company was losing market share to other money transfer companies and the Company would be forced to drastically lower its prices in certain corridors in order to stem the market share losses and effectively compete; and

(f)     based upon the foregoing, defendants lacked a reasonable basis for their positive statements about the Company or its outlook during the Class Period.

40.     On October 30, 2012, Western Union issued a press release announcing its third quarter 2012 financial results.  The Company reported net income of $269.5 million, or $0.45 diluted

EPS, and revenue of $1.4 billion for the third quarter ending September 30, 2012.  Significantly, the

Company now reduced its 2012 revenue, operating margin and EPS outlook.   According to

Defendants, Western Union's disastrous results and outlook were blamed in large part on the

implementation of new system requirements in its Mexican operations required to comply with the

Southwest Border Agreement.  As a result of the new requirements, the Company was forced to

terminate its relationship with 40% of its Mexican locations as many of its agents were unable to

meet the new heightened standards.  The disruption in the Company's Mexican locations further

caused a disruption in Western Union's Latin American operations.  The Company also stated that

its muted outlook was also due in significant part to intense competition in certain of Western

Union's key corridors.  For the quarter ending September 30, 2012, Western Union reported a 2%

increase in revenue growth versus a 13% increase at Moneygram and a 25% increase at Euronet.

Mexico was a particular problem for Western Union as it reported an 18% decline in revenue

compared to a 19% increase at Moneygram and an 18% increase at Euronet.  As a result, the

Company announced that it would be forced to drastically reduce prices in certain of its corridors by

upwards of 5% in 2013 versus only 1% in 2011 and 2012 in order to stem market share losses.  The

Company further announced that it would be restructuring its management by eliminating the

position of Stewart Stockdale, the former head of its global consumer financial services division, and

the regions would instead be reporting directly to the CEO of Western Union.  Defendant Ersek

stated, in pertinent part, as follows:

> In the third quarter our revenues increased 1%.  Business was challenging, as soft
> global economic conditions, ***compliance related changes, and competitive pressures
> in certain money transfer corridors impacted revenues***.  Globally, Western Union
> branded consumer money transfer revenue grew slightly in constant currency terms,
> with our on-line business once again delivering very good results.  We continue to

generate strong cash flow, and year-to-date we have now returned over $600 million to shareholders through share repurchase and dividends.

We are continuing to advance our growth strategies: expanding our network in consumer money transfer; adding on-line and other digital capabilities to attract new consumers; acquiring business customers and expanding geographies in our business-to-business segment; and establishing a global presence in stored value. As we have progressed through 2012, however, the market environment in consumer money transfer has become more difficult, especially in recent months. To better position us for the sustainable growth of this business we are implementing a series of strategic actions, with a focus on enhancing our value proposition, continuing to invest in the fast growing digital channels, and further optimizing our cost structure.

Enhancing our value proposition will include improving the customer experience and accelerating pricing investment in certain corridors. Although these investments will negatively impact short-term financial results, we believe they are the right actions to regain market share momentum and drive long-term revenue and profit growth. Similar initiatives have delivered solid results in the past, such as with our U.S. domestic money transfer repositioning in late 2009.

41.     After releasing its third quarter 2012 results on October 30, 2012, Western Union hosted a conference call for analysts, media representatives and investors, during which defendants represented the following:

[ERSEK:] Turning back to consumer money transfer, as we have progressed through the year, and especially the last few months, the market environment in retail money transfer has become more difficult. And we have market share challenges in certain key corridors. While we believe we have gained or largely maintained market share the last several years, a combination of factors appear to be driving challenges this year, especially in recent months. ***These factors include the impact of compliance changes, particularly those related to our Southwest border agreement. The level of our prices related to competitors in certain corridors.*** And higher market growth in the higher principal electronic segment that has seen a relatively smaller presence here, although we are growing very fast and have a big opportunity.

***We have made and will continue to make compliance-related enhancements and changes around the world to meet new and evolving requirements. These actions have had a negative impact on our revenues in some markets and have added expenses to our cost structure***. However, we believe it is our responsibility to maintain our industry leadership by implementing feature-rich compliance practices to protect our customers and agents around the world. ***The biggest impact from compliance-related changes has been in Mexico and Latin America***.

- 22 -

In Mexico, our Western Union brand is performing largely in line with the market. ***However, our overall revenue decrease over 20% in the quarter due to declines in our Vigo and Orlandi Valuta brands.  We ended relationships with over 7,000 Vigo agent locations that could not meet our new compliance requirements***.  We also experienced operational challenges from related system implementations for our Vigo brand in Latin America, as we moved this onto our Western Union platform.

*       *       *

***Aside from compliance-related issues, we are also seeing market share challenges this year from competitive pressures in other parts of the world***.  We are implementing a series of strategic actions to quickly adjust to this environment and regain market share momentum.

*       *       *

While our brand remains strong and stands for trust, reliability, speed, and convenience, we need to enhance overall consumer value proposition in certain corridors.  For competitive reasons, we will not disclose these specific plans, but beginning in the fourth quarter, ***we will accelerate our pricing actions in key corridors.***  In 2013, we will also address other areas of the consumer value proposition, as needed.  While not finalized at this point, we expect our 2013 pricing investment may be in the mid single-digit range as a percentage of revenues compared to 1% in both 2011 and 2012.

42.     As a result of these disclosures, the price of Western Union stock plummeted $5.20 per share to close at $12.73 per share on October 31, 2012, a decline of 29% on heavy trading volume of 63 million shares.

43.     Thereafter, on February 12, 2013, after the close of trading, Western Union reported financial results for the 2012 fourth quarter and full year (ended December 31, 2012), and its financial outlook for 2013.  In the press release, and during the conference call Western Union conducted that evening, investors learned for the first time, in pertinent part, as follows:

(a)     that Western Union had "spent ***over $40 million on Southwest Border Compliance activities since [it] signed the agreement in early 2010*** and made major changes to [its] business model in Mexico";

- 23 -

(b)    that "Western Union Business Solutions was recently added to the scope of the monitors' review";

(c)    for the fourth quarter 2013, the Company reported "[r]evenue of $1.4 billion, *flat on a reported and constant currency basis* compared to" fourth quarter 2012, and for the full year, the Company reported only a 3% revenue increase;

(d)    that *"[r]evenue for the Vigo and Orlandi Valuta brands declined over 50% [during fiscal 2013] primarily due to the Mexico location reductions in the third quarter, which resulted from the Southwest Border compliance changes*," and that "Vigo and Orlandi Valuta represented about 2% of total company revenue for the full year";

(e)    that the Company's C2C revenue, which constituted 81% of revenues in the fourth quarter 2012 "decrease[d] 2% on a reported and constant currency basis," stating that, "[t]ransactions and revenue for the Vigo and Orlandi Valuta brands *declined as a result of compliance changes related to the Southwest Border Agreement*";

(f)    that for the fourth quarter 2012 in C2C, "North America region *revenue decrease[d] 9%* from the prior year period, *primarily due to the impact of compliance related actions affecting the Vigo and Orlandi Valuta brands* serving the U.S. to Mexico and various Latin American countries";

(g)    that Western Union's overall operating margin fell from 25% in the fourth quarter 2012 to 20.1% in the fourth quarter 2013; and

(h)    that Western Union expected "pricing and other investments to result in *revenue and operating profit declines in 2013*," including "[l]ow single digit constant currency revenue declines" and a continuing "GAAP operating margin of [only] 20%," stating that

"[a]pproximately two-thirds of the GAAP operating margin decline compared to 2012 is attributable to *actions being implemented to improve competitive positioning*, including the impact of pricing investments, and mix," and the "remaining one-third is primarily attributable to other growth investments *and increased compliance costs*."

44.     As disclosed in the Company's quarterly financial report on Form 10-K filed with the SEC on February 22, 2013:

> *Including the costs required pursuant to the agreement and settlement, the Company has spent over $40 million since 2010 on its compliance programs along the United States and Mexico border.  We are considering entering into an extension of the term of the agreement and settlement or another arrangement with the State of Arizona*, either of which would require the approval of the State of Arizona and *could have further adverse effects on our business, including additional costs*.  The monitor has made a number of recommendations regarding our compliance programs.  While the Company has devoted significant time and resources to these efforts, *it is expected that not every recommendation of the monitor will be fully implemented within the required timeframe ending on July 31, 2013.  If the Company is not able to negotiate an extension of the agreement and settlement or other arrangement and the State of Arizona determines that the Company has committed a willful and material breach, the State of Arizona has indicated that it will pursue remedies under the agreement and settlement, which could include initiating civil or criminal actions.  The pursuit by the State of Arizona of remedies under the agreement and settlement could have a material adverse effect on our business, financial condition or results of operations*.

45.     Thereafter, on October 29, 2013, the Company reported its third quarter 2013 financial results and its downgraded fiscal 2014 financial guidance.  Western Union reported an operating income of $869 million in the first nine months of 2013, down 17% from its total in the same period a year ago.  Compared with the third quarter of 2012, operating profit for the third quarter 2013 was down 19%.  Western Union also said that it would earn $1.38 to $1.43 a share in 2013, below forecasts for $1.44.  The Company also said that *it did not expect any earnings growth*

- 25 -

*in fiscal 2014* because ***compliance costs would rise to 4.5% in fiscal 2014***.  Specifically, Western

Union stated, in pertinent part, as follows:

> While the Company has increased its investments in compliance considerably in
> recent years, ***significant additional investment in 2014 is now anticipated in light of***
> ***the current environment and our internal reviews of the increasingly complex and***
> ***demanding global regulatory requirements. . . . Western Union expects its***
> ***compliance related expenses to increase from approximately 2.5% of revenue in***
> ***2013 to a range of approximately 3.5% to 4.5% of revenue in 2014***, based on
> preliminary reviews of the programs.  Although the Company is in the early stages of
> its 2014 budgeting process, it still expects revenue growth in 2014, but ***no longer***
> ***expects growth in operating profit due to both these incremental costs as well as***
> ***potential business impact from new compliance procedures***.

46.     On this news, the price of the Western Union stock – which had significantly

recovered from its October 2012 lows due in no small part to the ***more than $351.4 million*** the

Company spent repurchasing more than 26.78 million shares in the fourth quarter 2012 and the

additional ***$314.5 million*** the Company spent repurchasing 21.1 million shares during the first and

second quarters 2013 – again plummeted, declining $2.39 per share – more than 12% – on extremely

high trading volume of 55 million shares trading, or 8.6 times the average daily trading volume over

the preceding ten days.

47.     As further explained in the Company's quarterly financial report filed with the SEC

on Form 10-Q on November 4, 2013:

> Pursuant to the terms and conditions of the Settlement Agreement, the costs of the
> investments in the Company's programs and for the monitor were expected to be
> $23.0 million over the period from signing through 2013; ***however, actual costs have***
> ***exceeded this amount.***  The monitor has made a number of recommendations related
> to the Company's compliance programs.  In addition, ***in the fourth quarter of 2012,***
> ***the Company's Business Solutions business was included in the scope of the***
> ***monitor's review***.  On June 14, 2013, [Western Union] and the State filed a Joint
> Application for Order Tolling Time and Extending Benefits and Obligations of
> Settlement Agreement (the "First Motion") in the Superior Court of the State of
> Arizona In and For the County of Maricopa (the "Superior Court").  The First
> Motion requested, among other things, that the Superior Court issue an order to

extend the timeframe during which the recommendations of the monitor must be implemented for an additional 90 days beyond the original required implementation date of July 31, 2013. The Superior Court issued the requested order on June 14, 2013. [Western Union] and the State filed a second Joint Application for Order Tolling Time and Extending Benefits and Obligations of Settlement Agreement (the "Second Motion") on October 25, 2013, and the Superior Court issued the requested order on October 28, 2013. The Second Motion requested, among other things, extension of the timeframe during which the recommendations of the monitor must be implemented until December 20, 2013. *The purpose of the extension until December 20, 2013 is to allow the parties to continue discussions regarding potential amendments to the Settlement Agreement.* The parties agreed to and requested additional time to conclude discussions regarding the potential amendments due to unforeseen and other circumstances, including the passing of the State's primary attorney on the matter. *The amendments under discussion may, among other things, further extend the term of the Settlement Agreement to provide [Western Union] additional time to implement the monitor's recommendations.* Any such modifications to the Settlement Agreement would require the approval of the State and *are expected to have adverse effects on the Company's business, including additional costs.* Additionally, *if [Western Union] is not able to negotiate a further extension or amendment of the Settlement Agreement or other arrangement and the State determines that [Western Union] has committed a willful and material breach of the Settlement Agreement, the State has indicated that it will pursue remedies under the Settlement Agreement, which could include initiating civil or criminal actions. The pursuit by the State of such remedies could have a material adverse effect on the Company's business, financial condition and results of operations.*

48.     The price of the Company's stock further declined following the November 15, 2013 announcement that defendant Scheirman had resigned and the November 18, 2013 announcement that Moody's Investors Service had downgraded Western Union's senior unsecured rating to Baa2 from Baa1, following a review of the Company's operating profile, citing, in large part: (i) the Company's huge compliance costs; (ii) that Western Union had given a constrained outlook regarding its 2014 operating profit stating it did not expect any operating profit growth in 2014 due to the higher compliance costs; and (iii) that Western Union's traditional money transfer business suffered from competitive pricing pressures and emerging payment technologies.

## LOSS CAUSATION/ECONOMIC LOSS

49.     During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Western Union common stock and operated as a fraud or deceit on Class Period purchasers of Western Union common stock by misrepresenting the Company's business and prospects.  Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Western Union common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Western Union common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e*., damages, under the federal securities laws.

## NO SAFE HARBOR

50.     Western Union's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

51.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Western Union who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants

expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Western Union common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Western Union has over 602 million shares of stock outstanding, owned by hundreds if not thousands of persons.

54.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Western Union common stock was artificially inflated;

and

(f)     the extent of damage sustained by Class members and the appropriate measure

of damages.

55.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class

sustained damages from defendants' wrongful conduct.

56.     Plaintiff will adequately protect the interests of the Class and has retained counsel

who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

with those of the Class.

57.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

58.     Plaintiff incorporates ¶¶1-57 by reference.

59.     During the Class Period, defendants disseminated or approved the false statements

specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading.

60.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Western Union common stock during the Class Period.

61. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Western Union common stock. Plaintiff and the Class would not have purchased Western Union common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the 1934 Act
Against All Defendants**

62. Plaintiff incorporates ¶¶1-61 by reference.

63. The Individual Defendants acted as controlling persons of Western Union within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Western Union common stock, the Individual Defendants had the power and authority to cause Western Union to engage in the wrongful conduct complained of herein. Western Union controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 10, 2013                THE SHUMAN LAW FIRM
                                        KIP B. SHUMAN (23593)
                                        RUSTY E. GLENN (39183)


                                                 *s/ Kip B. Shuman*
                                        KIP B. SHUMAN
                                        885 Arapahoe Avenue
                                        Boulder, Colorado 80302
                                        Telephone:  866/974-8626
                                        303/484-4886 (fax)
                                        kip@shumanlawfirm.com
                                        rusty@shumanlawfirm.com

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        MARY K. BLASY
                                        58 South Service Road, Suite 200
                                        Melville, New York 11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        mblasy@rgrdlaw.com

VANOVERBEKE MICHAUD
   & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, Michigan 48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _5_ day of _December_ , 2013.

CITY OF TAYLOR POLICE AND FIRE
RETIREMENT SYSTEM

By: _____

Its: _Chairman_____

- 2 -

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/17/2012 | 8,925 | $16.78 |
| 10/03/2012 | 15,289 | $18.25 |