**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

**Civil Action No. 13-cv-03325-MSK-MJW**

**CITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated,**

   Plaintiff,

v.

**THE WESTERN UNION COMPANY;**
**HIKMET ERSEK;**
**SCOTT T. SCHEIRMAN,**

   Defendants.

_____

**OPINION AND ORDER GRANTING MOTION TO APPOINT LEAD PLAINTIFF**
_____

**THIS MATTER** comes before the Court pursuant to motions by several Interested Parties seeking consolidation of this action with another case (since voluntarily dismissed and thus mooting that portion of the motions) and appointment as Lead Plaintiff: motions by Local 38, International Brotherhood of Electrical Workers Pension Fund ("IBEW") **(# 25)**, by Universal Gesellschaft m.b.H. ("Universal") **(# 27)**, by SEB Asset Management S.A. and SEB Investment Management AB ("SEB") **(# 31)**, and by Locals 302 and 612, International Union of Operating Engineers – Employers Construction Industry Retirement Trust and UA Local 13 Pension Fund & Employers Group Insurance Funds ("IUOE Funds") **(# 35)**.[1]  IBEW and Universal subsequently filed notices of non-opposition **(# 40, 48)** to other parties' motions, essentially withdrawing their requests (albeit conditionally).  SEB **(# 46)** and IUOE **(# 47)** filed

---

[1]   SEB subsequently moved for oral argument **(# 56)** on its motion.  The Court does not deem oral argument necessary and thus denies the motion.

1

responsive briefs in opposition to each others' motions, and further filed reply briefs **(# 51, 53)** to each others' oppositions. Plaintiff City of Taylor Police and Fire Retirement System has not filed any opposition to the Interested Parties' motions, and thus, the Court understands the issue before it to be whether SEB or IUOE should be designated Lead Plaintiff to further pursue this action.

## FACTS

The facts pertinent to the issues before the Court in the instant matter have relatively little to do with the lawsuit, itself. It is sufficient to observe that Plaintiff City of Taylor Police and Fire Retirement System, as well as all of the interested parties, are shareholders of The Western Union Company ("Western").

In 2010, Western resolved ongoing litigation with several states over the use of its money transfer services to launder criminal proceeds. Western agreed to engage in certain compliance and monitoring programs. Between February and October 2012, Western repeatedly informed shareholders that it estimated that the costs of such compliance programs would be "up to $ 23 million."

The Plaintiffs contend that, in actuality, Western knew that its compliance costs would be almost double that amount, and also anticipated a disruption in the revenue from that business sector that it failed to disclose. The Complaint, brought on behalf of a putative class of all Western shareholders during the relevant period, alleges two claims: securities fraud, in violation of § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, against Western itself, and control person liability under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against Western's officers.

Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, any member of the putative class may seek appointment as "Lead Plaintiff" for the remainder of the litigation. That request must be made within a 60-day period that begins on the date that the original plaintiff publishes notice of the suit. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). The Court is required to select as Lead Plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members" (*i.e.* the "most adequate plaintiff"). 15 U.S.C. § 78u-4(a)(3)(B)(i). As noted in the initial paragraph of this Order, multiple parties sought such designation, but based on subsequent events, the number of contenders for that title is now down to two: SAB and IUOE.

## **ANALYSIS**

In selecting the "most adequate plaintiff," the PSLRA instructs the Court to indulge a rebuttable presumption in favor of the movant who "has the largest financial interest in the relief sought by the class," so long as that movant otherwise satisfies the requirements of Fed. R. Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)-(cc). As relevant here, that presumption may be rebutted by a showing that the presumptive representative "is subject to unique defenses that render [it] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).

It appears to be undisputed that SEB initially enjoys the presumptive title of "most adequate plaintiff" based on the size of its financial interest in the litigation. SEB claims losses of approximately $ 4.6 million, while IUOE claims losses of approximately $ 800,000. However, IUOE argues that the presumption that SEB should be the lead plaintiff is rebutted because SEB is subject to two unique defenses: (i) that SEB, as an asset manager, lacks standing to bring suit in its own right, as the Western stock in question here was purchased and held by

3

several discrete investment funds; and (ii) that as a foreign entity,[2] SEB is unique in that there is some uncertainty as to whether an adverse judgment rendered in this action would be granted *res judicata* effect in its countries of origin. IUOE contends that the unique defenses are sufficient to rebut the presumption based strictly on SEB's financial interests, and that IUOE should be appointed Lead Plaintiff. (IUOE also argues that SEB is an inadequate class representative under Fed. R. Civ. P. 23, but only for the same reasons addressed herein.)

**A. Standing**

IUOE's contention that SEB lacks standing to pursue claims derives from *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008). As described by the court, the issue in that case was

> whether an investment advisor that has (a) discretionary authority to make investment decisions for its clients, and (b) a power of attorney from its clients to bring this lawsuit, has constitutional standing to sue for violations of federal securities laws on behalf of its clients, who are the beneficial owners of the underlying securities, and not in its own name.

*Id.* at 103. Plaintiff Huff was "an investment advisor for institutional investors such as public employee pension funds." *Id.* at 104. It alleged that Adelphia Communications Corporation had engaged in securities fraud, and that various defendants (including named defendants Deloitte & Touche) facilitated Adelphia's fraudulent statements. Notably, Huff did "not allege that it was an investor in Adelphia; instead, Huff claims that it provided investment advice to its clients and . . . purchased Adelphia securities on their behalf." *Id.* Relying on the fact that Huff possessed power-of-attorney delegated by the investment funds themselves and the fact that it had

---

[2] SEB consists of SEB Investment Management ("SEB IM"), an investment manager organized under the laws of Sweden, and SEB Asset Management ("SEB AM"), an entity organized under the laws of Luxemborg. SEB IM held a much larger position in Western's stock during the time period at issue – approximately 1 million shares – while SEB AM held only about 50,000 shares.

"unfettered discretion to make investment decisions" for those funds, the trial court denied the defendants' motion to dismiss Huff's complaint for lack of standing.

On appeal, the Second Circuit explained that "the minimum requirement for an injury-in-fact [sufficient to grant standing to sue] is that the plaintiff has legal title to, or a proprietary interest in, the claim." *Id.* at 108. It held that "a mere power-of-attorney – *i.e.*, an instrument that authorizes the grantee to act as an agent or an attorney-in-fact for the grantor – does not confer standing to sue in the holder's own right because a power-of-attorney does not transfer n ownership interest in the claim." *Id.* Thus, it found that "Huff's power-of-attorney is not purported to be a valid assignment and does not confer a legal title to the claims Huff brings." *Id.* at 109.

The court also considered an alternative argument put forward by Huff: that "it qualifies for a prudential exception to the injury-in-fact requirement because of its authority to make investment decisions on behalf of its clients." *Id.* The court acknowledged that it had recognized third-party standing in situations where the named plaintiff has "a close relationship to the injured party" (such as those of trustee-trust, guardian *ad litem*-ward, receiver-receivership, and executor-estate) and that "a barrier to the injured party's ability to assert its own interests" exists. *Id.* However, it rejected the suggestion that "investment manager standing" could exist, as "the investment advisor-client relationship is not the type of close relationship that courts have recognized" and that Huff had not shown a "hinderance" to its clients pursuing the claims directly. *Id.* at 110.

IUOE argues that *Huff* controls in this case. Like *Huff*, SEB is an investment manager, rather than a purchaser of Western shares for itself. SEB manages several investment funds, and its purchases of Western stock were made on behalf of those funds. The funds themselves

5

owned and held Western's stock during the time period at issue, and there is no indication that SEB ever held Western stock in its own name or for its own benefit. IUOE also points out that, as in *Huff*, SEB purports to be acting on behalf of the funds (as if pursuant to a power-of-attorney), but does not purport to hold a proprietary interest in the securities fraud claims of its own.

In its reply, SEB tendered various declarations or position papers from lawyers in Sweden and Luxemborg, opining that under those nations' laws, the funds themselves are not legal entities capable of possessing causes of action in their own names, and must instead pursue such claims through SEB, the fund manager. For example, attorney Anders Månsson opines that under Swedish law, "the Fund is not a legal entity [and] has no legal capacity whatsoever." He states that SEB "is authorised to make all decisions on the Fund's behalf including, for example, decisions to purchase and sell securities . . . and decisions to initiate legal actions and to pursue claims relating to investments made on the Fund's behalf." He notes that "the Fund does not have any right to appear before a court of law or any other public authority in any capacity. Any action relating to a Swedish investment fund must be brought by or against the fund company, in this case, SEBIM." He states that under Sweden's Investment Funds Act, "the powers usually associated with the ownership of the assets in the investments" are held by SEB, not the funds themselves. Thus, "Swedish law authorizes SEBIM to bring suit in its own name . . . on the Fund's behalf." SEB tenders a letter from Lyons & Loeff, a law firm in Luxembourg, offering essentially the same opinion of SEB AM's status under Luxembourg law. Thus, SEB argues that it falls within the "prudential exception" contemplated in *Huff*, as it both occupies a close relationship with the investment funds themselves – indeed, it is, for all transactional purposes,

6

the funds' alter ego – and that an obstacle – the lack of independent corporate existence by the funds themselves – prevent the funds from bringing this action in their own name.

Moreover, SEB argues that the Southern District of New York recently (post-*Huff*) found SEB to have standing to bring securities fraud claims on behalf of its investment funds in a recent decision, *In re Vivendi Universal, S.A. Securities Litigation*, 605 F.Supp.2d 570 (S.D.N.Y. 2009). In *Vivendi*, SEB was one of several investment managers who brought securities fraud claims against Vivendi, and Viviendi moved for summary judgment against the investment manager plaintiffs, alleging their lack of standing. Expressly addressing *Huff*'s "prudential exception," the *Vivendi* court commented on the "special relationship" requirement. It observed that in that the examples given in *Huff* – trustee-trust, or executor-estate – "owing to the special nature of their relationship to the assets' beneficial owners, the law grants these plaintiffs the right – if not imposes upon them the duty – to bring these claims." *Id.* at 576. Thus, it construed the "special relationship" portion of *Huff*'s "prudential exception" to examine "whether the special relationship between the plaintiff and the beneficial owner of the claim is such that the right to bring the claim inures to the plaintiff by operation of law." *Id.* This relationship, plus a barrier to the claims' owner bringing suit, is thus sufficient to invoke *Huff*'s "prudential exception." *Id.* at 576-77.

Turning to the particular plaintiffs, *Vivendi* notes that certain plaintiffs, including SEB AB, "argue at length . . . that certain of them function as trusts – for some or all of the funds they represent – under the laws of . . . Sweden." *Id.* at 577. In specifically addressing Vivendi's argument against SEB, the court found as follows:

> Defendants challenge only SEB AB's right to sue on behalf of a
> single fund governed by Swedish law. The Court need look no
> further than defendants' own expert to conclude that SEB AB, the
> undisputed management company for the fund, has standing to

7

> bring its claims.  Defendants' expert concedes that the fund 'does not have standing before a curt of law, as it is not a legal person," that the management company "shall represent the [investors in the fund[ in respect to all issues," and that "the Swedish management company shall act in its own name stating the fund's generic name."  Defendants' expert further concedes that in writing the law government the funds, the legislature intended to "import the main characteristics of the Common law trust."  In light of these statements, the court concludes that SEB AB has standing to sue on behalf of the Swedish fund because it qualifies for the *Huff* exception.

*Id.* at 581.

IUOE's reply, filed simultaneously with SEB's, does not address *Vivendi* or directly attack the declarations and opinion letters attached to SEB's reply.  It anticipated the possibility that SEB's reply would "submit evidence of standing for the first time," and argued that the Court should disregard such evidence.  It cites to *In re Bard Associates*, 2009 WL 4350780 (10th Cir. Dec. 2, 2009) (unpublished), in which the 10th Circuit refused to grant Bard's request a writ of mandamus vacating the District Court's appointment of Ord as Lead Plaintiff.  Bard and Ord, both investment managers, had sought certification as Lead Plaintiff when *Huff* was decided.  In response to *Huff,* Ord challenged Bard's standing, noting that Bard had not obtained assignments of its clients' claims (whereas Ord, presumably, had).  Bard subsequently obtained such assignments, but the District Court "conclud[ed] that the PSLRA's strict time limits precluded it from considering assignments made after the filing of Bard's lead plaintiff motion."  *Id.* at *1. Bard sought a writ of mandamus, arguing that "the district court adopted an unduly strict interpretation of the PSLRA's 60-day deadline," but the 10th Circuit held that the District Court's decision that Bard "demonstrated its financial interest too late because it did not produce assignments of its clients' claims until after the 60-day deadline . . . was not an abuse of discretion," as "the concept announced in *Huff* is not new."  Based on *Bard*, IUOE argues that

8

SEB's submission of its declarations and opinion letters, coming after the PSLRA's 60-day deadline for applying for Lead Plaintiff status, is thus untimely.

*Bard* is clearly distinguishable from the instant case. There, Bard did not have standing at the time it first sought appointment as lead plaintiff, because it had not secured assignment of its clients' claims. Although *Huff* had not yet explicitly expressed that requirement at the time of Bard's initial request, the 10th Circuit makes clear that Bard should have nevertheless anticipated that problem and promptly secured such assignments. It was not until after the 60-day PSLRA period that Bard secured the assignments, and thus, obtained the standing that it needed. In short, at the time Bard sought appointment as Lead Plaintiff, it lacked standing to bring the claims in question. By contrast, here, the factual and legal basis of SEB's standing is unchanged between the time it filed its motion for appointment as Lead Plaintiff and its submission of the declarations and opinion letters. In other words, the facts that give SEB standing have not changed since its motion, although SEB may arguably be criticized for not initially providing all of the legal argument and opinion along with that initial motion.

However, the Court will not disregard SEB's presumptive entitlement to Lead Plaintiff appointment and award that title to IUOE simply because SEB failed to anticipate that IUOE would object to its standing. On the one hand, IUOE's motion is arguably justified under *Huff*; on the other hand, SEB might have reasonably believed that a case like *Vivendi*, decided some five years ago, put that issue to rest. Because this Court's interest is in resolving disputes on their merits, not on procedural technicalities, the Court is not inclined to ignore SEB's supplemental submissions, particularly where they would appear to persuasively resolve IUOE's objections, simply because they were not tendered earlier. IUOE has not argued that it should be afforded a sur-reply to contest SEB's assertions regarding Swedish and Luxembourg law, or

9

otherwise argued that it was somehow prejudiced by SEB's disclosure of the opinion letters for the first time in reply. Thus, the Court finds it proper to rely on those letters.

This Court is persuaded, by both the opinion letters tendered by SEB and by the decision in *Vivendi*, that IUOE's concerns about SEB's standing are unfounded. At least on the record presently before the Court, it would appear that SEB comfortably fits within *Huff*'s "prudential exception," given that SEB holds trustee-like powers over the funds property and the funds are prohibited under Swedish and Luxembourg law from bringing the claims herein in their own right. Accordingly, the Court finds that concerns about SEB's standing are insufficient to overcome its presumptive status as "most adequate plaintiff."

**B. *Res judicata***

IUOE's second contention is that SEB, as a foreign entity, is subject to a unique defense from Western under the doctrine of *res judicata*. It relies on occasional decisions in which courts have excluded foreign citizens and entities from a putative class because of the possibility that their own nations "would not recognize a United States judgment in favor of the defendant as a bar to a [domestic] action" by the very same foreign class members. *Citing Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996-97 (2d Cir. 1975). Having reviewed the authorities cited by both IUOE and SEB on this point, *e.g. Foley v. Transocean Ltd.*, 272 F.R.D. 126, 133-34 (S.D.N.Y. 2011) ("Courts in this District and others have routinely appointed foreign investors as lead plaintiff"), the Court finds IUOE's contentions unpersuasive.

Concerns about foreign nations failing to give *res judicata* effect to a judgment by this Court in favor of a defendant are not unique to this type of action; indeed, any action by a foreign plaintiff in a U.S. court carries the risk that the unsuccessful plaintiff will attempt to commence a second suit in his or her home nation in order to obtain a second bite at the apple. Short of

10

closing the courthouse doors to all but U.S. citizens, there is little that this Court – or any domestic court – can do to prevent such mischief. In an age in which securities transactions are increasingly made without regard to international borders, this Court is not prepared to take so drastically curtail the availability of judicial remedies based on an entirely speculative[3] fear of rogue plaintiffs. The purchases of Western stock at issue here took place on a U.S. stock exchange and the alleged fraudulent statements were made by Western in the United States. The Courts of the United States are thus a logical place for those injured by the alleged false statements to seek recompense. Absent some more concrete showing that SEB's foreign status poses a justified concern that it might seek to evade any *res judicata* effect that an adverse judgment against the class might have, the Court finds that IUOE's concerns are insufficient to overcome the statutory presumption that SEB is the "most adequate plaintiff."

## CONCLUSION

For the foregoing reasons, SEB's motion for appointment as Lead Plaintiff **(# 31)** is **GRANTED**, and SEB is designated Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(i). Under 15 U.S.C. § 78u-4(a)(3)(B)(v), the Court authorizes SEB to retain its current counsel to pursue this action or, alternatively, SEB may apply to the Court for leave to retain other counsel.

---

[3] None of the authorities cited by IUOE identify any specific occasion in which a foreign litigant, unsuccessful in the U.S., actually successfully persuaded their home nation's courts to ignore the U.S. judgment against them and allow them to re-litigate the matter. Indeed, it appears to this Court that this fear, like most boogeymen, is more fearsome in theory than in reality.

SEB shall file any Amended Class Action Complaint within 30 days of this Order. The remaining parties' motions **(# 25, 27, 35)** are **DENIED**. SEB's Motion for Oral Argument **(# 56)** is **DENIED** as moot.

Dated this 26th day of September, 2014.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge