IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-03325-MSK-MJW

SEB ASSET MANAGEMENT S.A., and
SEB INVESTMENT MANAGEMENT AB,

Plaintiffs,

v.

THE WESTERN UNION COMPANY,
HIKMET ERSEK,
SCOTT T. SCHEIRMAN, and
STEWART STOCKDALE,

Defendants.

---

## REPORT & RECOMMENDATION ON

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) AND THE PSLRA (Docket No. 79)

---

**Entered by Magistrate Judge Michael J. Watanabe**

On October 30, 2012, Western Union announced that it had parted ways with

three things: 40% of its retail agents in Mexico; half of its projected revenue growth for

the year; and its Head of Global Consumer Financial Services.  Unsurprisingly, Western

Union's stock fell 29%.  This lawsuit alleges that Western Union's executives misled the

investing public about the state of affairs leading to these events, in violation of Sections

10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a).

As to each alleged misrepresentation, Plaintiffs fail either to plead a materially

misleading statement or omission, or to raise a strong inference of scienter.  *See* 15

U.S.C. § 78u-4(b) (pleading requirements under the Private Securities Litigation Reform

Act of 1995 ("PLSRA")).  The Court therefore recommends that Defendants' Motion to

Dismiss (Docket No. 79) be granted.

## Factual Summary

Defendant Western Union is "a global money movement and payment services

provider."  (Docket No. 68 ¶ 2.)  In its "core component"—representing "more than 80%

of Western Union's revenues"—it facilitates consumer-to-consumer ("C2C") money

transfers "through three separate brands: (i) Western Union; (ii) Vigo; and (iii) Orlandi

Valuta." (*Id.* ¶¶ 2–3.)  The individual Defendants are or were senior executives: Hikmet

Ersek, the President and CEO; Scott Scheirman, the Executive Vice President and

CFO; and Stewart Stockdale, the Head of Global Financial Services until October 2012.

(*Id.* ¶¶ 23–25.)

Beginning in 2001, the State of Arizona began an investigation into Western

Union's legal-compliance practices—more specifically, into whether Defendants were

doing enough to prevent their services from being used to transfer and launder money

for "drug cartels, human smuggling operations, weapons dealers, and terrorists"

operating along the United States-Mexico border.  (*Id.* ¶¶ 6–7.)  In February 2011,

Western Union settled its issues with Arizona, agreeing to:

> (i) reimburse the State of Arizona up to $21 million for costs incurred in
> pursuing its investigation of Western Union;
>
> (ii) pay up to $50 million to fund a multi-state non-profit organization
> promoting safety and security along the border between the United States
> and Mexico;
>
> (iii) make investments in the Company's compliance program along the
> border between the United States and Mexico; and
>
> (iv) engage an independent monitor (the "Monitor") to

> (a) assess the adequacy of Western Union's compliance program in light of anti-money laundering laws,
>
> (b) make recommendations to improve Western Union's compliance program, and
>
> (c) oversee Western Union's implementation of and adherence to these recommendations.

(*Id.* ¶ 8 (paragraph formatting altered).)   The parties refer to this settlement agreement as the Southwest Border Agreement.

On October 30, 2012, Western Union announced its earnings report for the third quarter of 2012.  According to Plaintiffs:

> . . . Western Union stunned investors by revealing that it had "***ended relationships with over 7,000 Vigo agent locations that could not meet our new compliance requirements***"—***approximately 40% of the Company's agents in Mexico***.  The Company further announced that as a result of the impact of compliance-related actions affecting the Vigo and Orlandi Valuta brands serving the United States and Mexico, ***Mexico revenue declined by 22% year-over-year, North America revenue declined by 8%***, and global [consumer-to-consumer] revenue declined by 1%.  Defendants further revealed that Western Union had been negatively impacted by "***market share challenges this year***," pursuant to which the Company would be "accelerating pricing investment in key corridors," which included price reductions.  In this regard, the Company stated that its ***pricing investment would be dramatically increased to*** "***the mid single- digit range,***" ***or more than 5% of revenues***—exceeding by five times the 1% pricing investment undertaken in 2011 and more than doubling the 1% to 2% of revenues that Defendants consistently represented during the Class Period would constitute the Company's pricing investments for the year.  The Company also abruptly announced that Defendant Stockdale had 'left the organization,' and that  Defendant Ersek would be absorbing  many of Defendant Stockdale's prior responsibilities.  Based upon these surprise measures that the Company announced in an effort to shore up its waning competitive position in the market, Western Union reduced its guidance for the remainder of 2012 and forecasted a steep 10% to 15% decline in 2013 revenues . . . .

(*Id.* ¶¶ 14–15 (emphasis in original).)  Stock markets were closed on October 30, 2012, but the following day "the price of Western Union common stock declined by $5.20 from

4

its prior closing price of $17.93 per share to close at $12.73 per share . . . a single

trading day decline of approximately 29%."  (*Id.* ¶ 16.)  The total loss in market

capitalization was $3.1 billion.  (*Id.*)

Plaintiffs attribute all or most of the bad news in the third quarter earnings report

to the Southwest Border Agreement.  Plaintiffs further allege that, in the months leading

up to October 30, 2012, Defendants misled investors about the full extent of the

oncoming damage.  The specific statements at issue will be discussed in detail below.

## Legal Standards

In deciding a Rule 12(b)(6) motion, the Court "must accept all the well-pleaded

allegations of the complaint as true and must construe them in the light most favorable

to the plaintiff."  *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir. 1997) (internal

quotation marks omitted).  Further, the Court "must consider the complaint in its entirety,

as well as other sources," including "documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

### Section 10(b)

Section 10(b) of the Securities Exchange Act prohibits the "use or employ[ment],

in connection with the purchase or sale of any security . . . [of] any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe."  15 U.S.C. § 78j(b).  The SEC's Rule 10b–5 implements

§ 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit

to state a material fact necessary in order to make the statements made . . . not

misleading . . . in connection with the purchase or sale of any security."  17 C.F.R.

§ 240.10b–5.  Thus, § 10(b) "affords a right of action to purchasers or sellers of

securities injured by its violation." *Tellabs,* 551 U.S. at 318, 127 S.Ct. 2499.

"A plaintiff suing under [§] 10(b), however, bears a heavy burden at the pleading

stage."  *In re Level 3 Communications, Inc. Sec. Litig.,* 667 F.3d 1331, 1333 (10th Cir.

2012).  To properly state a claim for securities fraud, a plaintiff's complaint must allege

facts supporting the following:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading;
>
> (2) the statement complained of was made in connection with the purchase or sale of securities;
>
> (3) the defendant acted with scienter, that is, with intent to defraud or recklessness;
>
> (4) the plaintiff relied on the misleading statements; and
>
> (5) the plaintiff suffered damages as a result of his reliance.

*Adams,* 340 F.3d at 1095 (paragraph formatting altered).

In addition, the PSLRA created a heightened pleading standard for the first and

third of these elements.  *Id.* at 1095–96.  Under the PSLRA, in order to overcome a

motion to dismiss, the complaint must "specify each statement alleged to have been

misleading, the reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state

with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1)(B).

With respect to scienter—"a mental state embracing intent to deceive, manipulate, or

defraud," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976)—it is not

sufficient "for a plaintiff to allege generally that the defendant acted with scienter, as

6

permitted under Fed. R. Civ. P. 9(b)."  *Level 3,* 667 F.3d at 1333.  Rather, the plaintiff

must, "with respect to each act or omission alleged to violate this chapter, state with

particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind."  15 U.S.C. § 78u–4(b)(2)(A). "The inquiry . . . is whether *all* of

the facts alleged, taken collectively, give rise to a strong inference of scienter, not

whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,*

551 U.S. at 322–23.  Moreover,

> [t]he strength of an inference cannot be decided in a vacuum.  The inquiry
> is inherently comparative: How likely is it that one conclusion, as
> compared to others, follows from the underlying facts?  To determine
> whether the plaintiff has alleged facts that give rise to the requisite "strong
> inference" of scienter, a court must consider plausible, nonculpable
> explanations for the defendant's conduct, as well as inferences favoring
> the plaintiff.

*Id.* at 323–24.  "A complaint will survive . . . only if a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged."  *Id.* at 324.

Section 20(a)

Section 20(a) of the Securities Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under
> any provision of this chapter or of any rule or regulation thereunder shall
> also be liable jointly and severally with and to the same extent as such
> controlled person is liable, unless the controlling person acted in good
> faith and did not directly or indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a). "[T]o state a prima facie case of control person liability, the plaintiff

must establish (1) a primary violation of the securities laws and (2) 'control' over the

primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).

## Discussion

Defendants challenge the two elements of a § 10(b) action that are subject to PSLRA's heightened pleading rules: whether the complaint adequately pleads material misrepresentations or omissions, and whether the complaint adequately pleads scienter. As to the individual Defendants' liability under § 20(a), Defendants argue that Plaintiffs have not established a primary violation under § 10(b) and therefore cannot be vicariously liable.

## I.    Material Misrepresentations or Omissions

Plaintiffs point to statements made by the individual Defendants on six different occasions. These allegedly false statements are presented here with a fair amount of context, because "[w]hether information is material also depends on other information already available to the market; unless the statement 'significantly altered the "total mix" of information' available, it will not be considered material." *Grossman*, 120 F.3d at 1119 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

### A.    The February 7, 2012, Quarterly Earnings Conference Call

On February 7, 2012, Western Union "issued a press release announcing the Company's 2011 financial results and its 2012 financial outlook, including revenue growth, margin, and EPS guidance." (Docket No. 68 ¶ 2.) On a conference call that same day, the individual Defendants made the following relevant statements, with the allegedly misleading statements in bold:

So, we are focused on execution of strategic road maps this year.  We want to expand our networks at new -- to consumers and increase loyalty in core money transfer, build a world-class digital business, and integrate and expand business-to-business payments in 2012.  **We have a strong foundation with our brand, our global network, our consumer relationships, our regulatory and compliance capabilities, and our range of send-and-deliver options.**  We are building a strong foundation in business-to-business payments, and can leverage our strengths to establish leadership in electronic channels.  We expect overall growth to be some how challenging in 2012, due to economic conditions and the impact of currency translation.  However, we believe in the future opportunities of our businesses, and are investing in the key areas now, to position us for accelerated growth as conditions improve.

(Docket No. 79-4, p.8 (Defendant Ersek).)

Now I'd like to review our outlook for 2012  In general, we are anticipating a more challenging economic situation this year.  We saw some slow downs in our C2C business in the fourth quarter of 2011, and expect similar growth rates in 2012.  Out outlook assumes softness in Europe.  In the Americas, we expect our US outbound and domestic money transfer businesses to remain solid, but we are anticipating declines in Mexico, as we evolve our business model and compliance practices.

(Docket No. 79-4, p.8 (Defendant Sheirman).)

[Q:] . . . you did I think 4% growth in the fourth quarter and most of '11, so is the deceleration all just the Mexico and Russia adjustments that you're making?  What is your underlying assumption I suppose here on the macro, to get to the 2% to 4%?

[A:] Well, from the macro environment, I would say (inaudible) in Europe.  Parts of Europe is doing pretty well, I mean, the north part of Europe like Germany UK and France, we are growing there very well.  And but in the parts of Europe, like south -- southern Europe we do have some challenges here, we see some slowdown.  Partly also, we -- in Russia we do have a lower price competition there, in the retail markets.  And Mexico, we do have some Southwest border compliance issue.  We are upgrading there, our compliance environment, and also changing our business model.  But from general environment, economic environment, I would say that I am a little bit cautious on Europe generally, but that is showed also in Q4, the numbers has been a little bit slower than Q3.

(Docket No. 79-4, p.11 (Defendant Ersek, responding to a question).)

[Q:] . . . [L]ast question on Mexico.  Can you give a lot more color on what exactly you are doing there?  I just maybe, and I know you mentioned before, how you expect a little bit of slower trend, but maybe give us a little more explanation? . . .

[A:] [I]if you look at our Mexico business, it's **a little bit affected by ongoing compliance procedure**, which we are changing, especially from southwest the border.  As you recall we had an agree to 2009, to work with an independent monitor on our compliance activities.  And that we see that some of the activity has been impacted our business.  And we also are looking at 2012, of our model, our practices in Mexico.  **We are in the process of reviewing some agent agreement, and changing our operating model** . . . .  In Mexico, we are going to upgrade our compliance-related changes.  We are going to be more -- we really want to be the industry standard, and the highest standard of industry, I think we really want to be the highest there.  So **I believe that we have the right approach there**.  And just to put the things in perspective, as you know, none of our business, Mexico is not larger than 6% in 2011 of our business . . . .

(Docket No. 79-4, p.17 (Defendant Ersek, responding to a question).)

[Q:] The compliance issues in Mexico, are those industry-wide or company specific?  And maybe, if you could maybe a little more specific, in terms of how you're going to change the model?  And maybe some of the agents -- and how you deal with the agents, and will there be any impact on pricing in Mexico? Thanks.

[A:] . . . . On Mexico I would say that it is more Company-specific, because we came under 2009 in an agreement as you recall, and we are implementing really, with independent monitor, the agreement requirements.  And it does impact our business.  I would say that it also it sets industry standard, and which we are very proud.  And I think we're building on that, but it does impact our business, especially in some southwest border.  I think that is where we are really focused on that, and that is really a high priority within the Company.  And we believe that long-term, we -- in a very well-positioned environment with that.

[A:] Yes, and . . . on the agent model, we are currently in negotiations for agent renewals in Mexico.  So it is premature for us to talk about what is going to happen there.  But once things are finalized, we will be able to discuss that.

[Q:] Okay.  But that is on the receive side, not so much on the send side?

[A:] Yes, you're right.

[A:] Yes, on the Southwest border is on the send side, the compliance issues, Jim.

(Docket No. 79-4, pp.20–21 (Defendants Ersek and Scheirman, responding to questions).)

[Q:] I guess, it sounds like compliance and regulatory challenges are hampering the growth rate in several countries, Italy, Mexico, China.  I guess, Hikmet, do you worry that could spread to other nations, and just becomes a global phenomena?

[A:] Well, I think first of all, with our compliance ones, we are really on it.  I think **Western Union is, I believe has the focus, and is a high priority in our environment.  I think we are really setting the industry standard, and my aim is with our General Counsel, and with our anti-money laundering activities to setup, are a very high priority**, that is the first thing.  I would say that the regulatory environment in this business has been always challenging, in 200 countries.  I wouldn't say that as a (inaudible) out, because we have the right environment in many countries.  Don't forget that we have already zero thresholds, which we did implemented.  We work very closely with regulators.  And some of the (inaudible) of that, has been always a challenge to enter some markets, because of the regulatory environment.  **I feel quite confident that we have the right structure to meet the regulatory environment needs**.

(Docket No. 79-4, p.28 (Defendant Ersek, responding to a question).)

Plaintiffs allege that the bolded statements were materially false and misleading because they omitted or misrepresented the truth about the full extent of the damage being caused by the Southwest Border Agreement.  More specifically, Plaintiffs allege:

- Western Union's Mexican agents had begun leaving the company in mid-2011 as a result of the Southwest Border Agreement, in such numbers that Victoria Lopez-Negrete (Western Union's Senior Vice President and General Manager for North America) was reassigned from her regular duties to "rescue" the Mexican agent network (Docket No. 68 ¶¶ 50, 92(a));

- Plaintiffs' first confidential witness ("CW-1"), a Western Union vice president who worked on efforts to implement the Southwest Border Agreement, states that "things began hitting the fan" in mid-to-late 2011 and that it was "not a happy time" at the Company (*id.* ¶ 92(b));

- In truth, the new compliance measures were a competitive *dis*advantage in the U.S.-to-Mexico payment corridor, pushing agents and business away (*id.* ¶ 92(c));

- In truth, Western Union's compliance efforts in the U.S.-to-Mexico corridor were not "the industry standard" because Western Union was behind schedule in complying with the Southwest Border Agreement (*id.* ¶ 92(d)); and

- As of the date of this earnings call, Western Union had not yet hired analysts to review the applications submitted by its Mexican agents to show compliance with the Southwest Border Agreement (*id.* ¶ 92(e)).

For these reasons, Plaintiffs conclude that statements characterizing Western Union's compliance capabilities as strong or as a competitive advantage were misleading—and so too were statements minimizing the expected impact of compliance measures on the Mexico market.

None of Plaintiffs' alleged facts show literal falsity.  Plaintiff alleges that the Southwest Border Agreement was a competitive disadvantage, but nowhere in this February 7th earnings call did Defendants state anything to the contrary.  Plaintiff further argues that Western Union was not "really setting the industry standard" for compliance because it was actually behind schedule on implementing the Southwest Border Agreement—but Defendant Ersek's statement as to "really setting the industry standard" was addressed to the *global* context (Docket No. 79-4, p.28), and Plaintiffs' facts do not call that statement into question.  Earlier in the call, Ersek had referred to the Southwest Border Agreement's measures as setting the industry standard (*id.* p.20) and had said (as to Mexico specifically) "we are going to upgrade our compliance-related changes.  We . . . really want to be the industry standard, and the highest standard of industry, I think we really want to be the highest there" (*id.* p.17).  But

neither of these forward-looking statements can be said to be literally false just because Western Union was struggling to implement the full range of measures called for by the Southwest Border Agreement.

The statements arguably omit relevant information about the state of the Mexico market. Defendants stated that they anticipated revenue declines in Mexico, that their Mexico business was "a little bit affected by" the Southwest Border Agreement, and that they were "in the process of reviewing some agent agreement[s], and changing our operating model" in Mexico. (*Id.* pp. 8, 17.) But they did not disclose that, as Plaintiff alleges, "agents began leaving the Company around mid-summer 2011" as a result of the Southwest Border Agreement; that Lopez-Negrete had been "'peeled off' her regular duties and sent on a 'rescue' mission to convince the agents in Mexico to stay with the Company"; that Western Union had developed a strategy to cut prices in Mexico to stem its losses; nor that Western Union had yet to staff up its efforts to review agents' applications for compliance. (Docket No. 68 ¶¶49–52.)

But because these then-current facts are not inconsistent with anything Defendants said; the idea that agents were leaving, for example, or that a senior executive had assumed responsibility for limiting the damage, is not inconsistent with statements like "we are anticipating declines in Mexico, as we evolve our business model and compliance practices." Plaintiffs' allegations thus show only that Defendants' statements failed to disclose the full extent of *future* damage. "In evaluating the materiality of an event that is 'contingent or speculative in nature,' [the Supreme Court holds] that 'materiality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event

in light of the totality of the company activity.'" *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 238 (1988)).  These standards are not satisfied here.  Certainly, had it been known or foreseeable in February 2012 that 40% of Western Union's Mexico network would leave the company, that fact would have been a material omission.[1]  *See, e.g.*, *In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 541 (S.D. N.Y. 2011); *In re MoneyGram Int'l, Inc.*, 626 F. Supp. 2d 947, 976–78 (D. Minn. 2009).  But Plaintiffs' allegations do not show that such egregious facts were foreseeable.  Plaintiffs allege only that *some* agents were leaving the company and that the company took steps (assigning a top executive and developing a pricing strategy) to confront that problem.  This is not sufficient to render Defendants' February 7th statements materially misleading.

Finally, Plaintiffs also point to other statements in the February 7th earnings call, regarding Western Union's market share and pricing cuts.  (Docket No. 68 ¶¶ 93–94.) These allegations fail to state a claim for the same reason Plaintiffs' other February 7th allegations fail: the alleged facts do not show actual falsity, do not show material and foreseeable omissions, and the statements are not otherwise misleading to a reasonable investor.

The Court recommends that Defendants' motion to dismiss be granted as to the February 7, 2012, statements.

---

[1] This foreseeability discussion overlaps considerably with the scienter discussion below, because the inquiries are "intimately bound up with" each other.  *See City of Phila.*, 264 F.3d at 1265 (discussing foreseeability and materiality within context of scienter analysis).

B.      The March 13, 2012, Credit Suisse Conference Call

On March 13, 2012, Scheirman participated in a conference call as part of Credit

Suisse's Global Services Conference.  (Docket No. 68 ¶ 96.)  Scheirman made the

following relevant statements, with the allegedly misleading statements in bold:

> [Q:] Western Union has become one of the cheapest stocks in the
> processing space . . . .  There's always been this, kind of this dinosaur,
> bear case out there.  Can you say here that you're confident that the core
> C2C business, the business model is intact and you can grow the core
> C2C business over time?
>
> [A:] **[W]e are very confident in the core C2C business model.**  And it
> might be helpful to share a little bit of our strategies and where we're
> heading in this area.  But clearly if you look just over the last 10 years and
> using I-80 as our source, that every year we've continued to gain market
> share, each of the years over the last 10 years.  And today our share
> stands at about 18%.  **And we believe we have opportunities to**
> **continue to grow that share.**
>
> . . .
>
> [Q:] So not to put you on the spot, but do you think it's a 5% growth over a
> long period of time, is it -- can you grow faster, can you accelerate the
> growth?
>
> [A:] Clearly, our objective is we want to grow faster, gain market share at
> an accelerated pace, although we don't give long-term guidance for our
> objectives.  But what I would point you towards, Jim, is I-80, if you just
> look at near term, 2011, 2012, they estimate the cross-border remittance
> market is growing in that 5% range.  **We clearly feel like there's**
> **opportunities to continue to gain share at an increased pace as we**
> **move forward.  So, again, no long-term objectives as far as growth**
> **rates, but we feel like very much the growth story is intact in the core**
> **business.**

(Docket No. 79-6, pp.3–4 (Defendant Scheirman, responding to questions).)

> Really, what we've seen over the years, go back five or 10 years, a lot of
> competition, many competitors in the marketplace.  And today we only
> stand at about an 18% share.  **We do believe our brand, our agent**
> **network of 485,000 locations are really competitive strengths for us,**
> **along with our compliance programs.**  But specifically when it gets to
> pricing what we've seen there, we manage our business in roughly 16,000

corridors, and anytime we adjust pricing it's really an eye to gain market share and to do the things that, if you will, drive the strongest revenue and profit growth on a long-term basis.  And a few data points, if you look at 2011 our prices were down about 1%.  **If you fast forward that to the outlook we gave in February, about a month ago as part of our earnings conference, we see pricing being down 1% to 2%, so similar to what we saw in 2011.  But clearly what we feel with the combination of building our brand, evolving our product set, marketing through our loyalty program, and then some pricing adjustments here and there, we can continue to gain share as we move forward.**

[Q:] So you think pricing longer term minus two is the right thing to model?

[A:] Yes, I'd say historically we've seen it in the low single digits, declining in the low single digits, when you look at '11 down 1%, '12 may be down 1% or 2%, it might be down slightly as we look over the next few years, a few percentage points.

(Docket No. 79-6, p.6 (Defendant Scheirman, responding to questions).)

Each of the bolded statements—statements to which Plaintiffs object—are expressions of opinions.  Plaintiffs contend that the opinions are misleading and unfounded for the same reasons provided for the February 7th statements: because Defendants' Mexico market was already losing agents due to the Southwest Border Agreement, in such numbers that Western Union had tasked a senior executive with solving the problem and had developed pricing strategies to maintain or regain market share in Mexico; because the Southwest Border Agreement represented an immediate competitive disadvantage in the U.S.-Mexico payment corridor; and because Defendants were behind schedule under the Southwest Border Agreement.  (Docket No. 68 ¶ 99 (incorporating by reference ¶¶ 92 & 95).)

In securities cases, statements of opinions are treated somewhat differently than statements of fact—although they remain subject to the same objective-investor

standard for materiality.  A statement of opinion represents, at a minimum, that the declarant actually holds the opinion.  *See MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1113 (10th Cir. 2014) (discussing this topic in the context of Section 11 of the Securities Exchange Act).  Thus, if Scheirman did not actually believe the things he said he believed, the statements would be misleading.  Plaintiff has not alleged any facts suggesting that Scheirman misrepresented his own opinions, however, and so the statements cannot be actionable on this theory.

Opinions can be actionable in another way, though.  A statement of an opinion, in the securities context, also represents that the declarant has some reasonable basis for forming the opinion—that he knows enough facts to form the opinion, and that the facts known to him justify (or at least do not preclude) the opinion.  *See id.* at 1115–17 (context of Section 11 violations).  The Supreme Court recently explained this rule:

> [A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view.  And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.  Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful."  If the issuer makes that statement without having consulted a lawyer, it could be misleadingly incomplete.  In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere.  Similarly, if the issuer made the statement in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.  Thus, if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then §11's omissions clause creates liability.

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. ___,

Case No. 13-435 (March 24, 2015) (slip op. at 11–12) (internal citations and footnote

callouts omitted) (context of Section 11 violation).  But not every such omission is

misleading.  The Supreme Court went on to explain:

> An opinion statement . . . is not necessarily misleading when an
> issuer knows, but fails to disclose, some fact cutting the other way.
> Reasonable investors understand that opinions sometimes rest on a
> weighing of competing facts; indeed, the presence of such facts is one
> reason why an issuer may frame a statement as an opinion, thus
> conveying uncertainty.  Suppose, for example, that in stating an
> opinion about legal compliance, the issuer did not disclose that a single
> junior attorney expressed doubts about a practice's legality, when six of
> his more senior colleagues gave a stamp of approval.  That omission
> would not make the statement of opinion misleading, even if the minority
> position ultimately proved correct: A reasonable investor does not expect
> that *every* fact known to an issuer supports its opinion statement.
>
> Moreover, whether an omission makes an expression of opinion
> misleading always depends on context.  Registration statements as a
> class are formal documents, filed with the SEC as a legal prerequisite for
> selling securities to the public.  Investors do not, and are right not to,
> expect opinions contained in those statements to reflect baseless, off-the-
> cuff judgments, of the kind that an individual might communicate in daily
> life.  At the same time, an investor reads each statement within such a
> document, whether of fact or of opinion, in light of all its surrounding
> text, including hedges, disclaimers, and apparently conflicting information.
> And the investor takes into account the customs and practices of the
> relevant industry.  So an omission that renders misleading a statement
> of opinion when viewed in a vacuum may not do so once that statement
> is considered, as is appropriate, in a broader frame.  The reasonable
> investor understands a statement of opinion in its full context, and §11
> creates liability only for the omission of material facts that cannot be
> squared with such a fair reading.

*Id.*, slip op. at 13–14.

Applying this reasoning, none of the facts alleged by Plaintiffs suggest that

Sheirman's opinions were misleadingly unfounded, or that Schierman should have

included the facts in order to make his opinions not misleading.  Plaintiff alleges only

that Western Union faced difficulties in the Mexico market; Scheirman expressed

optimistic opinions about the overall global market, and Plaintiffs' allegations do not

suggest that his optimism was without a reasonable basis.

The Court recommends that Defendants' motion to dismiss be granted as to the

March 13, 2012, statements.

C.      The April 24, 2012, Quarterly Earnings Conference Call

On April 24, 2012, Western Union "issued a press release announcing its first

quarter 2012 results and reaffirming the 2012 guidance that the Company first provided

on February 7, 2012."  (Docket No. 68 ¶ 100.)  On a conference call that same day, the

individual Defendants made the following relevant statements, with the allegedly

misleading statements in bold:

> Our North American business was generally strong and we also saw
> improved revenue trends in the Middle East, Africa, and Asia-Pacific
> regions.  US domestic money transfer continued to delivered good growth
> and Mexico revenue increased in the quarter.  We expected softness in
> Europe and Russia this year and we did see flat results for the region
> compared to a year ago, but revenue trends were slightly improved
> relative to the fourth quarter.

(Docket No. 79-2, p.4 (Defendant Ersek).)

> Turning to North America, the region's revenues increased 5% compared
> to 2% last quarter.  US outbound in Canada strengthened while domestic
> money transfer continues to have solid momentum with revenue growth of
> 9% on transaction growth of 12% in the quarter.  Mexico improved from
> last quarter with both revenue and transactions increasing 3% in the
> quarter.  As we mentioned in February, we are still determining and
> implementing changes to our compliance-related practices in Mexico.
> **Although we still expect to see some negative impact on the Vigo
> and Orlandi Valuta brands as we evolve our business model and
> compliance-related practices throughout the year, our Western
> Union brand is performing well.**

(Docket No. 79-2, p.5 (Defendant Scheirman).)

[Q:] Can you just quickly update us on the compliance situation in Mexico? How that is progressing and by when do you expect to be in some compliance?

[A:] Yes, I think as we mentioned in our February earnings call, **we have been working with the appointed external monitor very close to determine and appreciate changes, which we have outlined in our agreement and improvements about anti-money laundering oversight along all the border.**  I think we did do some changes last year on the Vigo and on Orlandi Valuta brands and also on our brands ID threshold changes, which have impacted our high principal transfers, which we still see it.  Currently, we are also investing on the new technology changes and we have other many projects on the way.  We believe that these changes have affected our principal and market share in 2012, but we also believe that these changes are needed.  **These changes are happening and we are going to be, as an industry leader, we're implementing the changes and that will also impact all the industry long-term.**

[Q:] Thanks. Also, recently, research by (inaudible) Hispanic center seemed to suggest that migration from Mexico to US has deeply declined and that there's actually a reversal of trend where Mexicans are leaving the US and that trend has picked up.  Can you comment on that and how you see that impacting long-term growth in that corridor?

[A:] I think we believe that Mexico corridor for us is a very important corridor.  I think we believe there is still room to grow.  I believe that we're going to continue to invest on that.  I didn't see any big changes on our currencies impacted by migration changes.  But as I said, the biggest impact has been around our compliance programs.

[A:] As a reminder, I think everyone probably knows this, but it's probably worth saying is that Mexico is only about 6% of our top line, so it's one of many marketing.  When you think about a portfolio of business, Mexico is an important market, but just one of 200 countries.

[A:] And these changes have been in through other countries, many, many years, many migration regulations, all this has been here.

(Docket No. 79-2, pp.14–15 (Defendants Ersek and Scheirman, responding to

questions).)

Again, Plaintiffs point to the same set of facts to support their claim that these

statements were materially misleading (or that material facts were misleadingly

omitted): Defendants' Mexico market was already losing agents due to the Southwest Border Agreement, in such numbers that Western Union had tasked a senior executive with solving the problem and had developed pricing strategies to maintain or regain market share in Mexico; the Southwest Border Agreement represented an immediate competitive disadvantage in the U.S.-Mexico payment corridor; and Defendants were behind schedule under the Southwest Border Agreement.  (Docket No. 68 ¶ 103 (incorporating by reference ¶¶ 92 & 95).)

The latter bolded statements are not inconsistent in any way with Plaintiffs' alleged facts.  Plaintiffs allege that Defendants were behind schedule in implementing compliance measures, and that by mid-2013 Defendants were in material breach of the Southwest Border Agreement (Docket No. 68 ¶ 56)—but these facts do not establish that Defendants were not "working with the appointed external monitor very close to determine and appreciate changes" in April 2012.  Further, Plaintiffs allege no material omissions bearing on Defendants' state of compliance with the Southwest Border Agreement in April 2012.

As to the first objected-to statement from this earnings call—"[a]lthough we still expect to see some negative impact on the Vigo and Orlandi Valuta brands as we evolve our business model and compliance-related practices throughout the year, our Western Union brand is performing well"—the legal analysis mirrors the analysis used for similar statements in the February 7th earnings call.  Such minimizing language might be actionably misleading if, as of April 2012, the full extent of the oncoming damage to Western Union's Mexico network was reasonably foreseeable.  But all Plaintiffs have alleged is that some agents were already leaving and that efforts to

review the compliance-readiness of remaining agents were running behind schedule.

Nothing in Plaintiffs' complaint suggests that the oncoming loss of 40% of Western

Union's Mexican agents was any more foreseeable in April than it was in February; the

complaint alleges no additional facts that would distinguish the two time frames.  As a

result, the complaint fails to allege material misrepresentations or omissions in April, just

as it did for February.

The Court recommends that Defendants' motion to dismiss be granted as to the

April 24, 2012, statements.

D.      The May 9, 2012, Investor Day

Western Union held an "Investor Day" on May 9, 2012.  (Docket No. 68 ¶ 104.)

At that event, the individual Defendants made the following relevant statements, with

the allegedly misleading statements in bold:

> Before I discuss about the strategies, let me give you a few -- let me take
> a few minutes to remind you about our strengths of the Company.  These
> strengths separate us from the competitors -- **I believe they are a huge
> competitive advantage** -- our global network, our strong brand, our
> global organization and resources, and **our regulatory and anti-money
> laundering capabilities**.  There are not many companies worldwide
> which could show these capabilities to you.
>
> . . . **Our fourth competitive advantage is our global anti-money
> laundering regulatory capabilities.**  The regulations around our
> business are really highly complex.  And we have regulatory complexity in
> all our markets.  We have to comply with various acts and interdiction lists
> around the world, as well as maintain a very active risk management
> system to detect and deter potential money laundering activities.
>
> **It sounds complex and, indeed, it is complex, but we see that as a
> competitive advantage as we comply with various acts and
> interdiction lists around the world in 200 countries.**  And the
> regulatory environment is changing constantly in different parts of the
> world.  Let me give you an example.

A recent example here in the US actually with money transfer providers now have to adopt to conform with the rules of Dodd-Frank Act. Implementation and operation of the new disclosure requirements under Dodd-Frank is really complex.  **And, although, there are going to be some costs for to implement that, we view as a competitive advantage.**

**We have the technology and resources available to meet the installation needs across our agents that are based in the US while others may -- don't have the resources and the technology.**

To protect our customers, our brand, to comply with rules and regulations, globally, we dedicate about 600 employees around the globe to these efforts and we spend yearly about $60 million on anti-money laundering regulatory environment.

(Docket No. 79-7, p.5–6 (Defendant Ersek).)

So, many investors always ask me, why you, Hikmet -- why you at Western Union think that you can grow this business, and why you're going to be successful rather than any technology company?  Let me spend a few minutes in explaining this one.  First, as you recall, it's important to remember Western Union is today market leader in money transfer business.  We have built an incredible network over the years now with 500,000 retail locations in 200 countries and territories.

Our brand is well known and trusted around the globe.  **We have the regulatory and anti-money laundering capabilities to operate in all countries.**  We can convert and settle in more than 100 currencies.  Our retail network serves as the hub in the center.  It's a global network with one-stop shopping.

We connect third party agents to our network.  We connect grocery store to banks, check cashers to post offices, banks to mom and pop shops. We connect 16,000 corridors.  We connect millions of customers wherever they are.  Our agents range from some of the largest banks in the world to the smallest neighborhood shops in the rural areas.  But the common thread is always we connect all for them with one-stop shopping.

Western Union is a trusted brand for millions of customers, a trusted friend for agents and support -- has the operational system for the money transfer business.

(Docket No. 79-7, p.10 (Defendant Ersek).)

> **We believe the opportunity to accelerate growth over the next few years are strong.  Despite the economic challenges in some parts of the world which exist today, we believe we have the right growth model.**
>
> **We believe in our core money transfer business and are taking steps to drive a higher growth rates than we have seen recently.**  We can compliment with this -- with higher growth with business solutions and very high growth from our smaller early stage businesses such as digital and stored value.

(Docket No. 79-7, p.11 (Defendant Ersek).)

> And as Hikmet mentioned, we're keenly focused on three key growth areas.  **And those growth areas very much leverage our strength, our brand, our distribution network, our compliance and regulatory capabilities and our organization and our infrastructure.  And we believe by leveraging these strengths and focusing on our strategies and our strategic roadmaps and being very focused on execution, we can deliver strong returns in each of these areas over the years to come.**
>
> Let me first start with the total shareholder return model and give you an outline and then jump into some more details.  It first starts with revenue growth.  And as Hikmet mentioned, we believe we've got opportunities over the next several years to accelerate the pace of revenue growth as we move forward.  **Every day we think about how do we grow the top line, how do we gain market share.**

(Docket No. 79-7, p.12 (Defendant Scheirman).)

> And I do want to mention Dodd-Frank this morning, that as we begin to implement that in 2012 we believe we'll incur some one-time incremental costs to implement Dodd-Frank and some ongoing costs too.  **But as Hikmet mentioned, we believe our compliance capabilities on a long-term basis are very much of a competitive advantage as we move forward**.

(Docket No. 79-7, p.13 (Defendant Scheirman).)

> And growing Mexico for better, we've been in Mexico over 150 years.  Mexico is the perfect example about how Western Union evolves with its agents and evolves with the environment.

24

Mexico is the 12th largest country in terms of population, with 111 million people. Fifty percent of those people are under the age of 25. It is estimated that 28% is in informal activity of all the economic activity.

There's a huge opportunity. And the market is evolving extremely rapidly. With [Elektra and Banamex], we've had a longstanding relationship and we're evolving that relationship to be able to expand our services and channels in Mexico.

Mexico has been traditionally a receive country. We're growing our outbound Mexico to the world business and you will be hearing much more in terms of how we're diversifying that country -- that business to drive our Western Union brand equity.

In closing, it's all about execution, flawless execution for growth. We are improving our products and services for sustained growth. We have solid momentum with our banks. We continue to expand our distribution and product diversification. **And we're investing in Mexico to accelerate our growth.**

(Docket No. 79-7, p.28 (non-party Victoria Lopez-Negrete).)

We are changing the company. We are taking to the next level. We put the fundamentals and the beauty of that is that we are building on our existing assets. We have the global brand awareness. We have the global network. **We have the regulatory environment.**

**It scares to death the competitors to enter this market, I'll openly say it. But this is good. It's good that this business is complex because we have the competencies.** We are very focused as a team with our agents to take this company to the next level.

With the growth, the margin expansion will come. Our investments is in the ventures or is in the sales force to grow the business will pay back. I'm very confident about that. We do have challenges, economic challenges globally, parts of worldwide -- parts of Europe still have challenges, parts of other, unemployment rate doesn't help.

But this will change that will help also to grow our business. The regulatory environment challenges are here. They are constant. They're happening but it's part of our business. **However, I believe that we have the right business plan, right model to grow this business short term and long term.**

(Docket No. 79-7, p.59 (Defendant Ersek).)

As with the statements made earlier in the year, Plaintiffs find these statements

misleading because Defendants' Mexico market was already losing agents due to the

Southwest Border Agreement, in such numbers that Western Union had tasked a senior

executive with solving the problem and had developed pricing strategies to maintain or

regain market share in Mexico; because the Southwest Border Agreement represented

an immediate competitive disadvantage in the U.S.-Mexico payment corridor; and

because Defendants were behind schedule under the Southwest Border Agreement.

(*Compare* Docket No. 68 ¶ 110, *with* Docket No. 68 ¶ 92.)

In the Court's view, Plaintiffs' claim is controlled by the Tenth Circuit's analysis in

*Level 3 Communications*, 667 F.3d at 1340.   There, Level 3 Communications had been

struggling to merge its operations with a newly acquired subsidiary.   Over a series of

public statements, the defendants repeatedly stressed Level 3's purportedly strong

ability to manage mergers.   As to such statements, the Tenth Circuit noted:

> As defendants clearly recognized, reasonable investors wanted to
> know how Level 3's integration efforts were progressing in 2006 and 2007.
> . . .
>
> The importance of integration to Level 3 and its investors does not,
> however, mean that everything defendants said on the topic was material.
> Many of the statements in plaintiff's complaint are, as a matter of law,
> nothing more than puffery.   For instance, defendants' representations
> regarding Level 3's integration skills, such as that "Level 3 is a logical
> consolidator with proven integration experience," are simply incapable of
> objective verification.   Similarly, the assertion that "this year is really
> focused on integration and getting synergies from all those acquisitions"
> must be characterized as vague (if not meaningless) management-speak
> upon which no reasonable investor would base a trading decision.   We
> also include in this category defendants' general, forward-looking
> expressions of confidence in future integration progress. *See, e.g.,* [] ("We
> are equally focused on insuring that the excellent reputation that Level 3
> has earned over the years for customer service does not get degraded.");
> [] ("[W]e remain confident in our end-state architecture and will make

> meaningful progress toward our end-state environment during the balance of 2007.").
>
> Finally, broad claims by defendants regarding integration efforts and the customer experience overall are likewise non-actionable. *See, e.g.,* [] ("The integration of all the acquired companies is progressing well and we're beginning to see the benefits of synergies from those transactions."); [] ("The overall integration effort is tracking within expectations in this regard, and the overall customer experience is still positive."). These are all the kind of rosy affirmations commonly heard from corporate managers and numbingly familiar to the marketplace— loosely optimistic statements that are so vague, so lacking in specificity ... that no reasonable investor could find them important.

*Id.* at 1339–40 (most internal citations, quotation marks, and alterations omitted).

Virtually every one of Defendants' May 9, 2012, statements to which Plaintiffs object are precisely the sort of vague boosterism and corporate-speak that *Level 3 Communications* holds to be immaterial non-actionable. To the extent any of Defendants' statements are arguably less airy—*e.g.*, "We . . . are taking steps to drive a higher growth rates than we have seen recently"; "And we're investing in Mexico to accelerate our growth"—they are nonetheless not inconsistent with any of Plaintiffs' alleged facts.

Finally, Plaintiffs object to a discussion of pricing cuts that occurred during the May 9th Investor Day. (Docket No. 68 ¶ 113; Docket No. 79-7, p.57.) Plaintiffs allege that Defendants misleadingly represented that pricing cuts above a 1% or 2% level would not be necessary when the truth was to the contrary. Plaintiffs' allegation is meritless, because Plaintiffs' allegation is based on steeper pricing cuts imposed in 2013 and later, while Defendants' representation referred only to the level of cuts in 2012. Plaintiff fails to allege any actual inconsistency between Defendants' statements (or omissions) and the alleged truth of the matter.

The Court recommends that Defendants' motion to dismiss be granted as to the

May 9, 2012, statements.

     E.    <u>The June 12, 2012, William Blair & Company Conference Call</u>

On June 12, 2012, Ersek participated in a conference call as part of William Blair

& Co.'s Growth Stock Conference.  (Docket No. 68 ¶ 115.)  Scheirman made the

following relevant statements, with the allegedly misleading statements in bold:

> **One of our very strong competitive advantage is our regulatory environment, our regulatory and anti-money-laundering competency capabilities.**  It scares to death the competition to enter this market, the regulatory environment.  And I always say -- I know it's sometimes tough, but I always say it's good that the regulatory environment, that we as Western Union have these capabilities to serve the customers and give the trust to the customers they believe at Western Union.
>
> And we spend about $60 million yearly on the anti-money-laundering activities.  We have about 600 employees really looking after the regulatory environment on the day to day.  And don't forget, we are not only regulated in the US or in the UK; we are regulated in 200 countries. We do have different regulatory environment in 200 countries and Western Union has the competency to serve the customers.  And it's not easy to get a money transfer license in Tajikistan.  It's not easy to have a money license in Gabon and Brazil or other states I'm talking about.  So it's a competitive advantage for Western Union and we are very proud of that.

(Docket No. 79-1, p.5 (Defendant Ersek).)

> [Q:] I guess the number 1 question on disintermediation risk people will bring up frequently -- well, why wouldn't I just send money cross-border on PayPal?  What disintermediation risks do you most fear?  And why is somebody wrong to suggest that something like a PayPal or an iTunes could end up being a significant risk for you, or the mobile communications companies?
>
> [A:] Well, first of all, I got this question already 13 years and it has not been proven that somebody will take away our business.  And despite that we will grow in -- even in the real economic challenges 2009 we had only minus 2% revenue growth.  I think first of all you have to build the fundamentals we have done for many, many years.  **We be now in, as I**

**mentioned, in 500,000 locations in 200 countries -- somebody has to do that.  It's not easy to build that.  You have to get the regulatory environment -- somebody has to do that.  It's not easy to do that.  You have to [go down to] money laundering -- somebody has to do that.**  You have to settle in 135 currencies.  How do you settle in 135 currencies in minutes?  Somebody has to do that.  So that has been definitely something we are very proud.  We built that.  And has to be really done by someone else.

(Docket No. 79-1, p.7 (Defendant Ersek, responding to questions).)

As with the earlier statements, Plaintiffs allege that these statements are materially misleading in light of Western Union's difficulties in implementing the Southwest Border Agreement, and in maintaining its Mexico market share as a result thereof.  (Docket No. 68 ¶ 117 (incorporating by reference ¶ 110).)  As with the statements made at the May 9th Investor Day, the Court finds Plaintiffs' claim to be controlled by *Level 3 Communications*.  Ersek's statements on this conference call were mere corporate boosterism, and—being global in scope rather than Mexico-specific— were not inconsistent with the facts alleged by Plaintiffs.

The Court recommends that Defendants' motion to dismiss be granted as to the June 12, 2012, statements.

F.     The July 24, 2012, Quarterly Earnings Conference Call

On July 24, 2012, Western Union "announced its second quarter 2012 results and its outlook for the remainder of 2012."  (Docket No. 68 ¶ 118.)  On a conference call that same day, the individual Defendants made the following relevant statements, with the allegedly misleading statements in bold:

We also continue to focus on generating strong cash flow and deploying it for our shareholders.  **In 2012, we remain on track for the revenue, earnings per share, and cash flow outlook we provided at the beginning of the year, despite economic challenges.**  In the second

quarter, our consumer money transfer business, which represented over 80% of revenues, continued to deliver solid results.  [Agency] constant currency revenue increase 3% with consistent year-over-year operating margins.  There were some very strong large markets such as Germany, Saudi Arabia, and India that helped offset economic softness in Southern Europe and expected challenges in Mexico and Russia. . . .

**Our core business is sound, and our cash generation is strong.** We are executing against our strategic plans and look forward to advancing them further to accelerate our growth over the long term.

(Docket No. 79-5, pp.4–5 (Defendant Ersek).)

On a constant currency basis, revenue increased 3% in the quarter. Second quarter constant currency growth rates were below first quarter trends, primarily due to some additional economic softness in Southern Europe and the expected challenges in Russia and Mexico and we had slightly lower growth in the US.  The global distribution of our portfolio helped stabilize us against isolated regional dynamics and strong growth in countries such as Germany, Saudi Arabia, and India, helped drive overall growth. . . .

Turning to North America, revenue was flat with the prior year period on 2% transaction growth and the region represented 21% of total Company revenue.  US outbound revenue increased, although not as strong as the first quarter, while domestic money transfer revenue grew 4% on transaction growth of 7% in the quarter.  The domestic $5 for $50 continues to have strong growth, even compared to very high growth rates in the prior year.  Some of the higher tiered bands did not increase as fast and we are implementing new marketing programs to drive further growth.

Mexico revenue declined 7% and transactions decreased 5% in the quarter.  As you recall, we anticipated revenue climbs and share losses in Mexico this year, as we implement changes to our compliance related practices and business model. . . .

(Docket No. 79-5, p.5 (Defendant Scheirman).)

We have also adjusted our full-year 2012 outlook for operating margin reflect higher spending for other compliance costs, primarily relating to the Southwest Border Agreement.  Were working on dozens of projects around enhanced risk controls that have continued to evolve and we have increased our projected spend in 2012 primary for IT development and higher personnel costs.

**We expect global spending on compliance activities over the next couple of years will not change significantly from the 2012 levels as the breadth and complexity requirements and sustainability around the globe continues to expand.  But we view our ability to adapt to this environment as a long-term competitive advantage.**

(Docket No. 79-5, p.7 (Defendant Scheirman).)

**Overall, we're on track to deliver our financial outlook, despite the expected macro and other challenges and higher compliance costs, as our diversified portfolio allows us to produce stable results and generate and deploy strong cash flow.**

(Docket No. 79-5, p.8 (Defendant Scheirman).)

[Q:] The compliance costs moving up, do you think this will eventually apply to some of your smaller peers as well and perhaps, ease some of the competition, especially in pricing, going forward?

[A:] I think . . . it's upgrading our compliance.  **As you know, we're very focused here and we are very serious.  It's a competitive advantage, long-term.  I think we are investing heavily here to be, really I think as an industry leader, we are setting the tone here and I think we are very focused here and I see that as definitely a competitive advantage.**

(Docket No. 79-5, p.9 (Defendant Ersek, responding to a question).)

[Q:] A little more color maybe on North America, Mexico and some of the troubled regions on some of the trends that you saw there?  I think you outperformed what you thought in the first quarter; you certainly had pointed towards trouble in Mexico in the second quarter.  Could you go over, again, the growth rates in North America and Mexico and what you expect over the next several quarters?

[A:] Sure, let me start with some color, more color on North America . . . . I think, the Mexico business, North America outbound to Mexico business has been meeting our expectations.  **We were expecting some slow down due to our, some changes we implemented in the southwest border area.**  Don't forget that it's about 25% of our revenue is from the US outbound to Mexico is coming from the southwest border area.  25%, so it has slowed down.

We put some higher restrictions there, we put some higher requirement for customers and I think it impacted short term our business.  **Long term we**

31

**believe that we're going to be upgrading and we're going to set some industry standards here.**  That has been some Mexico. . . .

[A:] The only thing I would add that the third component of the North America business is US outbound and it continued to experience growth in the second quarter.  Not quite as strong as the first quarter, but it was still growing.  Just to reiterate with Mexico, it's really what we expected to have some challenges in 2012.  **But as we work through evolving the business model and so forth, we believe that will put us in a much stronger position on a long-term basis with Mexico.**

(Docket No. 79-5, p.10–11 (Defendants Ersek and Scheirman, responding to a

question).)

[Q:] While I think we all recognize there's been macro challenges impacting most businesses and I think you may have touched on this earlier in the call a bit, but can you just perhaps call out and list off the issues that may have inhibited growth rates in C2C over the past year that are really not correlated with macroeconomics, such as regulatory issues like those in Mexico and Russia? . . .

[A:] Sure. I can do that.  No secret is the Mexico southwest border investment that has been impacting our business and we think that has part of our slowdown on our growth.  And the other part is Russia.  In Russia it has been, as you know, we were late to the market in Russia due to some regulatory changes.  Since the first of January, we could expand retail.  We have a team there.  They're expanding to the retail network like we did in the PSD and the European Union.  We had some issues in China.  China slowdown had impacted our business a little bit and besides that, what else?  I think 6% is only the B2B business, so global trade doesn't have an overall revenue impact.  But on the C2C business, I would say these three areas had an impact to our business.

[Q:] Okay.  That's helpful.  If you were to sum up the impact of those three areas, and I think there's been a couple of other little smaller ones probably also, what would you say was the total impact to your full-year growth rate from those?  If you can at least give us a sense?

[A:] I would just probably characterize them that if those markets were growing versus where they're at, it would be helpful to where we're at.  But I don't want to put a precise number on that, because we're in 200 countries, 16,000 corridors, so there's some puts and takes.  But I think the good news with each of those three markets, China, Russia, and Mexico, we've got plans in place.  It will take its 2012 to execute and work

through those plans, but hopefully on a long-term basis, we'll be in a much better competitive position there.

[A:] Just to add on that . . . , largest market out of the US is 6% of our revenue.

(Docket No. 79-5, p.14 (Defendants Ersek and Scheirman, responding to questions).)

[Q:] I just wanted to ask you to elaborate on the intra-corridor trends for C2C.  Overall, the only geo with negative transaction growth was Europe, but just for Europe as well as other geos how did transactions trend each month in the quarter and if you can possibly give some color on July, how it's looking?

[A:] **First I'd say the broad headline is we're confident with the guidance that we've provided, the 2012 outlook we've provided today for revenue growth, margins, and EPS.  We're confident in the guidance that we've provided**.  As you may recall, our historical practice is we don't comment within a quarter or how the quarter looks because there could be seasonality, other things, as you go within a quarter or just looking at month by itself.  But the headline I would give you . . . is that we're comfortable with the guidance we provided today.

[Q:] Sure. I certainly understand that, but when you look at the sequential, Q2 is not as good as Q1, which is not a surprise to anyone.  But is it continuing to get worse or has it stabilized?  Your guidance would seem to imply it's stabilized.

[A:] **Again, I would probably go back to we're confident in our full-year outlook.**  If you compare the first quarter and the second quarter, Europe and the Americas, North America had some slighter softness, but if you look at Asia-Pacific, Latin America, the Middle East and Africa, each of those markets had growth rates that were very comparable to the first quarter, so they were strong.  We saw good growth with India, Saudi Arabia, Germany, and so forth.

That's the beauty of our business.  We're 200 countries, 16,000 corridors; it's a portfolio approach.  From quarter to quarter, month to month, you might have some puts and takes.  But overall within the 200 countries, we feel like we're driving in the right direction and doing the right things.

[Q:] Understood.  It's good to hear.  I want to ask about pricing.  It's still only a modest negative.  It seems like it's lower than historical trends, except for sporadic pricing initiatives.  What's a good price trend line for the next 12 months?  Negative 1 to negative 2?  Or will it get back to a historical negative 2 to 3?

> [A:] . . . **I think generally as we are looking corridor by corridor on our pricing, we are going, in 2012, we are going to be around 1%.  And 1% to 2%, that will be the next forecast.**  Given the environment, we are looking at price action corridor by corridor, but I would say 1% to 2% around that will be in 2012, probably.

(Docket No. 79-5, pp.16–17 (Defendants Ersek and Scheirman, responding to

questions).)

> [Q:] Hikmet, can you provide a little more color in terms of your turnaround strategies for Mexico and Russia?  Thanks.

> [A:] Sure.  **I think 2012 will be still both countries a little bit challenging until we turn around.**  I think we're investing on the Mexico and there are two different issues here.  In Mexico, it's more about upgrading our compliance in the Southwest border and other areas and setting the industry standards that long-term we are meeting the standard. I think in Russia, the issue is more than signing new retailers. . . .

> [Q:] Hikmet, you think the compliance issues are the main problem in Mexico?

> [A:] I think, in Mexico, one thing also happened is that we -- as the exclusivity ended, we are starting to negotiate with new agents, potential agents.  **As we speak, the team is there in Mexico and I think we are actively pursuing new agents there in Mexico that will help also to grow our business long-term in Mexico.**

(Docket No. 79-5, p.18 (Defendant Ersek, responding to questions).)

Again, Plaintiffs point to the same set of facts to support their claim that these

statements were materially misleading (or that material facts were misleadingly

omitted): Defendants' Mexico market was already losing agents due to the Southwest

Border Agreement, in such numbers that Western Union had tasked a senior executive

with solving the problem and had developed pricing strategies to maintain or regain

market share in Mexico; the Southwest Border Agreement represented an immediate

competitive disadvantage in the U.S.-Mexico payment corridor; and Defendants were

behind schedule under the Southwest Border Agreement.  (*Compare* Docket No. 68

¶ 123, *with* Docket No. 68 ¶¶ 92.)  As with earlier statements, none of Plaintiffs' facts

show literal falsity.

However, as to material omissions, the July earnings call is different from the

earlier calls—because it took place *during* Defendants' efforts to increase staffing for the

Southwest Border Agreement.  As alleged in the complaint:

> Meanwhile, in the basement of Western Union's headquarters, the Company brought in outside teams—including a team of approximately 30 – 35 Experis analysts *in June 2012*, including [Confidential Witness 2 ("CW-2")], and approximately 25 more individuals *in September 2012*—to review a stockpile of applications pertaining to the approximately 50,000 – 60,000 agents operating in the Southwest Border area, and to seek to bring into compliance the overwhelming majority of these agents, who were not in compliance.
>
> CW-2's tasks included: (i) performing the requisite review of agent applications, many of which were in Spanish, whereas few, if any Experis personnel working on the compliance review spoke Spanish; (ii) running background, FINCEN and GIS reports; (iii) processing the applications through Western Union Quality Assurance; (iv) e-mailing the agents regarding matters that required attention/correction; and (v) recording information regarding agent applications and their compliance status. CW-2 recalled an inability to review more than 3 or 4 agent applications per day.  *Further, CW-2 explained that no more than 20% of the applications reviewed were deemed to be in compliance, and a that "backlog" of non-compliant applications built-up while waiting for responses from the agents*. CW-2 recalled that only approximately 15% of the non-compliant agents were able to be brought into compliance.

(Docket No. 68 ¶¶ 52–53 (emphasis added).)  These facts indicate that the full extent of

the forthcoming turmoil in Western Union's Mexico market was more foreseeable in July

2012 than it was during the February and April earnings calls.

That said, Defendants' July statements are more negative than earlier

statements.  Defendants disclosed that revenues and overall transaction size had

declined in the Mexico market, and that their overall revenue growth occurred only

because other, stronger countries offset the losses in weak countries, including Mexico. They further disclosed that compliance costs under the Southwest Border Agreement were larger than expected and that the Southwest Border Agreement was impacting their business in Mexico in the short-term.  They stated that they needed to "work through evolving [their] business model and so forth" in Mexico, and that they were "pursuing new agents" in the country.  These statements are not inconsistent, in substance or in tone, with the facts alleged by Plaintiffs.  As a result, Plaintiffs have not adequately alleged that the omitted details were materially misleading.

The Court recommends that Defendants' motion to dismiss be granted as to the July 24, 2012, statements.

G.    The October 16, 2012, Voices of Experience Forum

Finally, Plaintiffs allege that, when speaking at a "Voices of Experience" forum at the University of Denver, Stockman repeatedly represented that Western Union's global compliance capabilities were a competitive strength.  (Docket No. 68, ¶¶ 130–32.) These statements are materially indistinguishable from the statements made on the June 12, 2012, conference call hosted by William Blair & Co., discussed above.  For the same reasons as applied to those June 12th statements, the Court recommends that Defendants' motion to dismiss be granted as to the October 16, 2012, statements.

II.    **Scienter**

Defendants also argue that Plaintiffs fail to plead facts giving rise to a strong inference of scienter.  As explained by the Tenth Circuit:

> The term "scienter" has been defined by the Supreme Court of the United States as "a mental state embracing intent to deceive, manipulate, or defraud."  The Supreme Court has further elaborated on the meaning of

the term by stating: "The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct."  Recklessness, defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," can also satisfy the scienter requirement for Section 10(b).  Simple negligence, however, does not satisfy the scienter requirement. . . .

"Intentional misconduct is easily identified since it encompasses deliberate illegal behavior."  Recklessness is much harder to define adequately.  [We have] stated both that "recklessness satisfies the scienter requirement for a primary violation of § 10(b)" and that recklessness is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

Courts have been cautious about imposing liability for securities fraud based on reckless conduct, however.  Plaintiffs should not be allowed to proceed with allegations of "fraud by hindsight," for example, because corporate officials should be liable for failing to reveal only "those material facts reasonably available to them."

*City of Phil.*, 264 F.3d at 1258–60.  Applying these principles to a claim for misleading

omission (rather than misleading misrepresentation), the Tenth Circuit concluded:

Thus, to establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors.  The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.

*Id.* at 1261.  As stated above, under the PLSRA, "[a] complaint will survive . . . only if a

reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged."  *Tellabs,*

*Inc.*, 551 U.S. at 324.

37

Defendants' statements throughout 2012 consistently disclose the fact that the Southwest Border Agreement represented a challenge to Western Union's business in the Mexico market.  Thus, the relevant question is whether Defendants misleadingly omitted the *extent* of the expected damage to their business.  Further, Plaintiffs rest their argument on recklessness rather than intentional fraud.  (*See* Docket No. 82, p. 49.)  To avoid dismissal, then, Plaintiffs must raise a strong inference that:

- the full extent of the oncoming damage to the Mexican market was so obvious that Defendants must have realized it (or that it was an extreme departure from their duty of care not to realize it) at the time they made the statements at issue; and

- the materiality, to the reasonable investor, of the full extent of the oncoming damage was likewise so obvious that Defendants must have realized it (or that it was an extreme departure from their duty of care not to realize it) at the time they made the statements at issue.

There can be no question in this case that, if the extent of the damage were known (or should have been known), that information was material and Defendants knew or should have known that it was material.  Thus, the only real dispute is on the first point: whether Plaintiffs have raised a strong inference that Defendants must have, or barring extreme negligence should have, known the full extent of the oncoming damage.

Plaintiffs' facts do not raise such an inference.  Plaintiffs *do* plead facts strongly supporting an inference that the individual Defendants were fully informed as to Western Union's ongoing efforts to comply with the Southwest Border Agreement and to preserve as much of its market share in Mexico as it could.  To support this inference, Plaintiffs allege:

- Defendants had reassigned a top executive to "rescue" the Mexico market and had developed a pricing strategy to combat the agent attrition in that market (Docket No. 68 ¶¶ 49–51);

- By Defendants' own admission throughout the conference calls and statements at issue in this lawsuit, they were intensely focused on the Company's efforts under the Southwest Border Agreement (*id.* ¶ 101 ("We have been working with the appointed external monitor very close"); ¶ 90 (claiming the Company was "really on it" when it came to monitoring the Company's compliance efforts, which were the Company's "focus" and a "very high priority"));

- The Southwest Border Agreement required Defendants to closely monitor implementation of and compliance with the Monitor's recommendations (*id.* ¶ 41); and

- Defendants received or had access to detailed internal reports—the "Pipeline Reports"—and weekly meetings/conference calls discussing those reports, which at least one Defendant attended at least once (*id.* ¶¶ 28–29, 55).

It is reasonable to infer that the individual Defendants read and understood the import of the Pipeline Reports, that they were briefed on the weekly meetings of the Southwest Border Agreement task force, and that they were aware of Western Union's affairs in Mexico in general.  Indeed, it is reasonable to infer that they were aware of the state of affairs with some specificity.

But none of those facts establish much of anything about whether the full extent of the damage to Western Union's Mexican market was foreseeable at any given point in time.  As Defendants put it in their motion to dismiss:

> Put simply, nothing . . . indicates that prior to later in the third quarter of 2012 any decision had been made or need recognized by any of the Individual Defendants to terminate the 7,000 agents (as opposed to continuing to pursue additional compliance efforts with respect to those agents).

(Docket No. 79, p.53.)  Nor does anything in the complaint suggest that the need to terminate 40% of Defendants' Mexican network was so obvious in, say, June 2012, that Defendants radically departed from their standard of care in failing to realize it.

39

This infirmity in the Plaintiffs' allegations is most obvious when Plaintiffs address the fact—so heavily relied upon throughout their complaint—that Defendants hired dozens outside contractors to review the compliance capabilities of their Mexican agents.  Plaintiffs argue:

> The most plausible inference arising from the Company's decision to hire outside compliance teams in June and September 2012 is that the Company was woefully behind in meeting [Southwest Border Agreement] requirements, not that Defendants were not yet aware of the issues and later decided—out of the blue in 3Q 2012—to terminate 7,000 agents and revise financial guidance.

(Docket No. 82, p.54 n.36.)  Plaintiffs are correct that the alleged fact of hiring outside contractors supports an inference that Defendants were behind schedule.  But that is not the only inference it can support; it would also support inferences that the Monitor demanded outside review, that Western Union simply didn't have the manpower to review every agent in one of its largest and oldest markets, or more narrowly that Western Union didn't have enough *Spanish-speaking* manpower for the job.  And more fundamentally, whatever inference one draws as to why outside contractors were needed, the fact they were needed suggests *nothing*—one way or the other—about whether Defendants should have known that droves of agents would ultimately fail the compliance checks.

The closest Plaintiffs come to creating such an inference comes in alleging that the full extent of the oncoming damage was reflected in the Pipeline Reports.  Plaintiffs' second confidential witness can allegedly testify that, from those reports, one would learn that no more than 20% of Defendants' Mexican agent network was initially compliant with the demands of the Southwest Border Agreement, and no more than

40

15% of the remainder ever became compliant after follow-up efforts.  (Docket No. 68

¶¶ 53, 57.)  But Confidential Witness 2 was hired in June 2012 (*id.* ¶ 52), and his

alleged testimony does not suggest *when* these numbers became obvious.  It is

perhaps reasonable to infer that the writing was on the wall at some early point.  But

since the compliance review reflected in these Pipeline Reports did not begin until July

2012, and was redoubled with additional hires only in September 2012, it is *not*

reasonable to infer that the writing was on the wall at the time of any of Defendants'

allegedly misleading statements.

Finally, Plaintiffs point to the departure of Defendant Stockdale, abruptly, on or

near the same day the 2012 third quarter earnings were announced.  If any other signs

of a fraudulent or reckless conduct were present, this fact might help support an

inference of scienter.  But on these facts, the more compelling inferences are of non-

actionable explanations: that Stockdale took the heat for the bad news, or even that the

bad news was interpreted as a sign of Stockdale's management failings.

Independent of Plaintiffs' failure to allege materially misleading statements or

omissions, the Court also recommends that Plaintiffs' complaint be dismissed as to

each set of statements for failure to allege scienter.

### III.    <u>Vicarious Liability</u>

Because Plaintiffs have not alleged a primary violation under § 10(b) of the

Securities Exchange Act, there is also no vicarious liability under § 20(a).  *See, e.g.*,

*City of Phila.*, 264 F.3d at 1270–71 (10th Cir. 2001).

## Recommendation

For the foregoing reasons, the undersigned RECOMMENDS that Defendants' motion to dismiss (Docket No. 79) be GRANTED and that Plaintiffs' Consolidated Amended Class Action Complaint (Docket No. 68) be DISMISSED in full.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions, Makin v. Colo. Dep't of Corr., 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated: April 14, 2015                    */s/ Michael J. Watanabe*
     Denver, Colorado                    Michael J. Watanabe
                              United States Magistrate Judge