**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 13-cv-03325-MSK-MJW

**SEB ASSET MANAGEMENT S.A., Individually and on behalf of all others similarly situated,**

      **Plaintiff,**

v.

**THE WESTERN UNION COMPANY,
HIKMET ERSEK,
SCOTT T. SCHEIRMAN, and
STEWART STOCKDALE,**

      **Defendants.**[1]

_____

**OPINION AND ORDER SUSTAINING IN PART AND OVERRULING IN PART
OBJECTIONS AND GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to the Plaintiff's ("SEB") Objections

(**# 86**) to the Magistrate Judge's April 14, 2015 Recommendation (**# 85**) that the Defendants'

Motion to Dismiss (**# 79**) be granted, and the Defendants' response (**# 87**).

## FACTS

The Court briefly summarizes the pertinent facts here and elaborates in its analysis.

According to SEB's Consolidated Amended Complaint, Defendant, The Western Union

Company ("WU"), is "a global money movement and payment services provider." At the times

pertinent herein, WU's "core component" was its "consumer-to-consumer" (or "C2C")

international money transfer business, the fees on which account for more than 80% of WU's

---

[1]     The Court has modified the caption found on the Plaintiff's Consolidated Amended
Complaint to properly identify the named class representative.

revenues.  That business was facilitated by independent "agents" – retailers, bankers, gas stations, and other businesses worldwide which were affiliated with WU and authorized to initiate or receive a money transaction.  Much of WU's business consisted of customers in the U.S. sending money to overseas recipients.  Mexico was one of the most frequent destinations of such transfers and thus, revenues from the Mexico market are one of the largest single components of WU's C2C business..

The international nature of the C2C business makes it particularly susceptible to use by criminals of all stripes – drug dealers, human smugglers, terrorists, and others – to facilitate transactions and launder proceeds of crimes.  SEB contends that, among C2C providers, WU was known to have particularly lax standards, such as a higher transaction amount threshold than other providers for which senders and recipients were required to identify themselves.  In addition, WU was less willing that other C2C providers to make reports of patterns of suspicious activity.  As a result, WU enjoyed an oversized presence in the market, particularly among those using the service for criminal purposes, and was able to command higher fees than other providers.

In 2001, the State of Arizona began an investigation into WU's compliance with its anti-money laundering policies and reporting obligations.  In February 2010, WU resolved that investigation by entering into a settlement, referred to as the Southwest Border Agreement (or, simply the "Agreement").  Among other things, the Agreement required WU to pay nearly $100 million in penalties and fees, invest significantly in its regulatory compliance programs, comprehensively review its agent network for compliance with WU policies, and retain the services of an Independent Monitor to oversee ongoing compliance with the Agreement and regulations.

In this suit, SEB takes issue with subsequent statements and representations made by WU's officers (and certain other employees) about the cost and effect of the Agreement on WU's business. As discussed in more detail below, on specific dates between February 2012 and October 2012, WU officers made a variety of statements in which they touted WU's efforts at enacting stronger compliance protocols and projected opportunities for growth, including in Mexico. SEB contends that these representations were false. It contends that in reality, WU was having great difficulty vetting its network of 50,000 agents in Mexico, was being forced to disqualify several thousand agents in Mexico due to their inability to meet new compliance requirements (ultimately resulting in a 40% reduction in the size of WU's agent network in Mexico), and anticipated lowering its fees in the Latin American market in order to remain competitive with other C2C providers. On October 30, 2012, WU announced the reduction of its Mexico network and confirmed that the loss of business (in Mexico and elsewhere) resulted in a decline in overall revenues of more than 20%, with similar results expected for the next few quarters. This announcement caused WU's stock price to drop approximately 30% in value.

SEB asserts two claims: (ii) securities fraud in violation of Section 10(b) and Rule 10(b)(5) of the Securities and Exchange Act, 15 U.S.C. § 78(j)(b) and 17 C.F.R. § 240.10b-5; and (ii) control person liability by each of the individual named Defendants pursuant to 15 U.S.C. § 78t(a).

The Defendants moved to dismiss **(# 79)** SEB's Complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that it failed to adequately allege particular false or misleading statements and because SEB had not alleged facts sufficient to show scienter. The Court referred the motion to the Magistrate Judge for a recommendation.

The Magistrate Judge recommended **(#85)** that the Defendants' motion be granted. Specifically, the Magistrate Judge found that: (i) none of the statements allegedly made by any Defendant were literally false; (ii) although the Defendants' statements omitted certain facts, such omissions were not material because the general tenor of the Defendants' statements remained consistent with the significance of the omitted information; and (iii) SEB failed to adequately allege scienter.  As a result, the Magistrate Judge concluded that the Complaint lacked facts demonstrating that the full extent of the damage to WU's Mexico market was foreseeable at any point when the Defendants were making statements.

SEB filed timely Objections **(# 86)**, arguing generally that the Magistrate Judge misapplied the law to the facts and failed to fully credit the allegations in the Complaint.

## ANALYSIS

### A.  Standard of review

The Court reviews the objected-to portions of the Recommendation *de novo*.  Fed. R. Civ. P. 72(b).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are referenced in the Amended Complaint and whose accuracy is not in dispute.  *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  To make such an assessment, the Court first discards those averments in the Complaint that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Id.* at 1949-50.  The Court takes the remaining, well-pled factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged.  *Id.* at 1950-51.  What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

To state a claim of securities fraud under Section 10(b), SEB must allege: (i) that a defendant made an untrue or misleading statement of material fact or failed to state a material fact necessary to make its actual statements not misleading; (ii) that the statement at issue was made in conjunction with the purchase or sale or securities; (iii) that the defendant acted with the requisite scienter – that is with the intent to defraud or with recklessness; (iv) that the plaintiff relied upon the misleading statements; and (v) that the plaintiff suffered damages as a result. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2407 (2014); *In re Level 3 Commnications, Inc. Securities Litigation*, 667 F.3d 1331, 1333 (10th Cir. 2012).

Because SEB's claims here sound in securities fraud, SEB is subject to additional pleading requirements under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).   For each alleged fraudulent statement, SEB must specify the particular misleading statement, identify the reasons why it is misleading, and state

the facts upon which SEB forms its belief as to those matters. *Id.* For allegations of each Defendant's scienter, SEB must state with particularity facts that give rise to a strong inference that the Defendant acted with the requisite state of mind. *Id.*

**B. Merits**

SEB's Complaint extensively recites various statements that SEB alleges were fraudulent or misleading. The Court addresses each of those statements, either in the text of its analysis or, as identified below, in an Appendix. Those statements can be generally grouped into four categories: (i) statements suggesting that WU's compliance-related activities would amount to a "competitive advantage" over its rivals; (ii) statements describing WU's "pricing investment" in 2011 and 2012, as well as forecasting it in the future; (iii) statements predicting growth worldwide; and (iv) specific statements about the Mexico C2C market. The Court addresses each in turn.

1. Compliance as "competitive advantage"

First, SEB takes issue with numerous statements by the Defendants that touted WU's increased compliance efforts and anti-money laundering policies as a "competitive advantage," a "long-term investment," "the industry standard," or other phrases that suggested that the issue as a positive trait of WU's business.

For purposes of simplicity in analysis, the Court will not set forth herein the statements SEB challenges; instead, the Court will generally summarize the statements here and set them forth verbatim in the Appendix. [2] A frequent talking point for WU was the fact that it had

---

[2]     Most of the statements that SEB relies upon were made by the Defendants at formal investor-focused events in which the entirety of the Defendants' comments were recorded and transcribed. SEB's Complaint quotes selectively from these transcripts. In their Motion to Dismiss, the Defendants submitted more complete transcripts encompassing the remarks quoted by SEB and their accompanying context. SEB's response to the motion did not object to the

operations in 200 countries and territories, and thus that it was subject to at least that many national laws and licensing regimes, as well as various international interdiction lists and other regulatory obstacles.  WU touted its efforts in this regard, suggesting that although these regulatory burdens were complex, constantly-changing, and expensive to keep up with (WU sometimes touted its staff of 600 for dealing with regulatory issues), they favored WU because these same burdens also "scared [its competitors] to death."  SEB alleges that these statements were misleading because, contrary to WU's promotion of its compliance obligations as a positive trait, in reality, WU was struggling to bring its agents in Mexico into compliance with the terms of the Agreement, that compliance burdens would eventually cause WU to terminate nearly half of its agents in Mexico (at great financial cost to WU), and that rigorous compliance with anti-money laundering policies would cause WU to surrender certain price premiums that its prior lackadaisical stance towards the use of its money transfer business by criminals allowed it to charge.

The Court declines to address these various statements individually, as it is apparent that they cannot possibly constitute actionable misstatements.  The statements in question are vague suggestions that WU would be a leader or trend-setter in the future, or that it was better positioned than its rivals to meet broad challenges.  These are the kind of "rosy affirmations

---

authenticity of these transcripts, nor do SEB's Objections take issue with the Magistrate Judge having considered them.  Because the transcripts are implicitly referenced in the Complaint and SEB does not object to their tender by the Defendants, the Court finds it appropriate to consider those transcripts when evaluating the sufficiency of SEB's Complaint under Rule 12(b)(6).  *See Gammel v. Hewlett-Packard Co.*, 905 F.Supp.2d 1052, 1061 (C.D.Ca. 2012).

The Court notes that the transcripts are either fairly rough or the Defendants' oral statements are particularly inartful, as the transcripts contain a host of grammatical errors, mismatched verb tenses, sentence fragments, and awkward punctuation.  In quoting from the transcripts in this Order, the Court has preserved the precise content of the transcripts themselves, rather than attempting to correct or streamline it.  Moreover, this Court has bolded the quoted text to match the bold text used by SEB in its Complaint to provide emphasis.

commonly heard from corporate managers and numbingly familiar to the marketplace – loosely

optimistic statements that are so vague, so lacking in specificity that no reasonable investor could

find them important." *See L-3 Communications*, 667 F.3d at 1340 (statements that "the

integration of all the acquired companies is progressing well and we're beginning to see the

benefits of synergies from those transactions" and "the overall integration effort is tracking

within expectations in this regard and the overall customer experience is still positive" were non-

actionable).

SEB alleges that these statements are misleading because: (i) WU was slow in achieving

compliance, to the point that by June 2012, it had a backlog of more than 50,000 agents on

whom background checks needed to be conducted, requiring WU to hire more than 50 additional

employees to address those checks; (ii) that WU's delay in achieving compliance was so

significant that by as late as 2014, the State of Arizona was prepared to declare WU in material

breach of the Agreement; and (iii) WU was aware that its compliance activities were causing it to

lose large numbers of agents in its Mexico network.

The Court finds that, notwithstanding SEB's allegations, nothing in the statements is

misleading.  The statements are patently true on their face - compliance with hundreds of discrete

national and international regulations is difficult and costly, and those difficulties and costs also

serve to discourage competitors from attempting to match the breadth of WU's market.  SEB

may be correct in recognizing a degree of hypocrisy by WU when, pre-Agreement, it was happy

to accommodate criminal use of its network in exchange for charging premium prices, but post-

agreement it became a fervent evangelizer for diligent legal compliance.  WU's sudden

conversion might seem convenient, but the Complaint alleges no facts to suggest that WU's pro-

compliance statements in 2012 were so insincere as to be deceptive.  The Complaint does not, for

example, point to internal criticism by the Defendants of WU's compliance activities or detail a concerted internal scheme to evade compliance obligations wherever possible. WU's decision to embrace the benefits of strict regulatory compliance may have been sudden and opportunistic, but the Complaint has not alleged any facts to suggest that it was misleading.

Moreover, the fact that WU may have been slow in completing its compliance activities does not render the statements misleading. The Complaint does not allege that at any time during 2012 WU suggested that its compliance activities (in Mexico or elsewhere) were complete, that they would be completed imminently, or that they would be simple or easy to achieve. To the contrary, the Defendants often spoke about compliance obligations as "complex," "changing constantly," and carrying both one-time and ongoing "costs" that would have to be paid. No reasonable investor hearing any of the statements listed in the Complaint on the subject of compliance would understand that WU was somehow representing that it had, by that point in time, fully-completed its obligations under the Agreement. To the contrary, in remarks in May 2012, Mr. Scheirman made clear that, to comply with the Agreement, "[w]e have to, if you will, enable 60,000 locations in a short amount of time with training, technology, agent implementation, and so forth," and clearly conveyed that the task had yet to be completed, telling investors that, in the future, WU would have some information about "what those costs [of doing so] might look like."

Accordingly, the Court categorically rejects SEB's arguments that any of WU's statements about its compliance activities being "a competitive advantage" or an "investment" or

any other statements promoting WU's activities in the area of regulatory compliance are actionable misrepresentations.[3]

### 2. Pricing

Next, several number of statements cited by SEB relate to comments by the Defendants forecasting WU's "pricing investment" in 2012 and beyond.  Because these statements do not generally vary in content, the Court merely summarizes them here, quoting them in full in the Appendix.  Throughout most of 2012, WU frequently advised analysts and investors that its "pricing investment" in 2011 had been 1%, and that WU anticipated that it would be between 1% and 2% in 2012.  In its disappointing October 30, 2012 announcement (the last day of the class period), WU informed investors that its pricing investment for 2013 "would be in the mid single-digit range . . . compared to 1% in both 2011 and 2012."  SEB alleges that that the predictions of continuing 1%-2% pricing investment were misleading because WU knew that it would have to surrender the pricing premium it enjoyed in Mexico as a result of its compliance efforts under the Agreement, both because tighter compliance would discourage criminals from continuing to pay a premium that WU was able to charge because of its lax regulatory enforcement in the past, and because WU knew that it would have to lower its prices in Mexico in order to stem the loss of defecting or non-compliant agents.

In addition to the statements themselves, SEB alleges that a witness known as CW1 "recalled seeing strategy memos that noted the expectation of losing agents in Mexico," and which outlined proposals for WU to revise its pricing strategy in the Mexico market to reduce fees and increase agent commissions in order to retain the loyalty of agents (presumably at the cost of reducing WU's own revenue).  The Complaint does not, however, place these memos in

---

[3]     Because the only alleged misrepresentation the Complaint attributes to Mr. Stockdale falls into this category, the Court dismisses the claims against Mr. Stockdale in their entirety.

any particular temporal context, making it difficult to ascertain from the Complaint when discussions of a new pricing strategy first appeared.  Nor does it expressly allege that the contents of such memos were known to the Defendants.  The Complaint addresses the matter somewhat obliquely, stating that CW1 "believed that the source of these strategy memos" were the Defendants "because . . . these individuals were responsible for pricing determinations" and because "corporate strategy was set by individual at a higher level at Western Union than the Steering Committee," but beyond CW1's belief and supposition, the Complaint does not specifically indicate that the Defendants knew of the pricing memos.

The Court agrees with the Defendants that nearly all of the statements cited by SEB merely repeat that WU was predicting that its pricing investment would remain at 1% - 2% through 2012.  There is nothing misleading about such a statement, as it appears to be undisputed that WU's pricing investment for 2012 was indeed in the 1% range; WU's October 30, 2012 statement that allegedly caused investor consternation was that its 2013 price investment was forecast to be significantly higher.  There is nothing particularly misleading about the statements by WU that limited their rosy forecasts to 2012.

However, the Court takes particular note of a single statement made by Mr. Ersek on July 24, 2012.  During the conference call on that date, an analyst asked for "a good price trend line for the next 12 months."  (Emphasis added.)  Mr. Ersek responded "I think generally as we are looking corridor by corridor on our pricing, we are going, in 2012, we are going to be around 1%.  And 1% to 2%, that will be the next forecast. . .  I would say 1% to 2% around that will be in 2012 probably."  (Emphasis added.)   The parties parse Mr. Ersek's July 24, 2012 statement differently: SEB construes Mr. Ersek's reference to "the next forecast" to be responsive to the analyst's request for a prediction "for the next 12 months" – that is, that Mr. Ersek's 1% - 2%

prediction included 2013.  The Defendants note that the reference to "the next forecast" is sandwiched between two statements unambiguously making a prediction only for the remainder of 2012.  Because the Court is required to draw all reasonable inferences in the light most favorable to SEB, it finds SEB's construction of Mr. Ersek's statement to be plausible.  Thus, the question becomes whether SEB has also alleged sufficient facts to indicate that this prediction was misleading – insofar as WU would increase that prediction somewhat several months later – and that Mr. Ersek acted with scienter when he made it.

The Court answers these questions in the negative.  Assuming that Mr. Ersek's prediction on July 24, 2012 was that 2013's pricing investment would remain consistent with 2012's, SEB alleges that this prediction was misleading because Mr. Ersek was aware of difficulties in the Mexico market that might require WU to make a number of price modifications there.  But it is clear from the context of the statements that Mr. Ersek's pricing investment predictions were company-wide predictions, not attempts to predict WU pricing investment for Mexico in particular.  Although it may be possible for SEB to allege facts that could demonstrate that a need to decrease prices in the Mexico market alone necessarily translates to a need to increase WU's overall pricing investment, SEB's current iteration of the Complaint fails to adequately do so.[4]  As best the Court can determine, SEB is relying on the fact that Mexico is one of WU's largest C2C markets, and thus, one could draw the inference that as goes Mexico, so goes WU's global pricing investments.  The Court finds this inference too great a leap to satisfy *Iqbal*'s "plausibility" standard.

---

[4]  SEB has not requested leave to amend its Complaint to cure any pleading deficiencies the Court might find, and thus, the Court does not *sua sponte* grant such leave.  SEB may, if it chooses, file a properly-supported motion to amend if it believes that it can cure the defects noted herein.

3. <u>Growth generally</u>

A number of statements cited by SEB involve the Defendants making generalized statements of their belief that there is room for "growth" in the C2C market or statements about WU's desire to pursue and achieve more growth in that business. Once again, the Court sees fit to corral these allegations to the Appendix and to merely summarize them here. All of the statements at issue refer generally to WU's <u>worldwide</u> C2C business; none of the statements purport to particularly address Mexico as its own market or made predictions of growth about the Mexico market.

SEB alleges that these statements are misleading because, at the time the Defendants made them, the Defendants were aware of the shrinking network of compliant agents in Mexico and the inevitable decline that the loss of those agents would have on WU's Mexico business. Even assuming that SEB is correct and that the Defendants always apprehended that compliance with the Agreement would result in diminished revenues in Mexico in 2012 and beyond, nothing in the record suggests that the Defendants did not simultaneously retain a justifiably optimistic forecast for continued growth in the C2C business <u>worldwide</u>, as reflected in their statements. This is particularly notable in several instances in which the Defendants expressly or impliedly acknowledged ongoing concerns about declines in the Mexico market while nevertheless persisting in their assertion that they expected to continue to grow the C2C business worldwide (bolding is SEB's emphasis, underlining is the Court's):

• On February 7, 2012, an analyst from William Blair & Company asked about WU's "growth rate," asking "do you think [you're] losing some market share now? I mean, the World Bank is looking for – I think upper mid-single digit transaction growth. I mean we saw MoneyGram [a competitor] report mid double-digit, like near, I think 13% transaction growth. I mean are some of these issues in Mexico and Italy and Russia, <u>are you currently losing market share</u>, do you think?" Mr. Ersek responded "We believe, in the cross-border money transfer, we gained market share. We compare . . . usually with IETA numbers, we believed we gain market share. <u>We do have, as I mentioned before, in some countries</u> like Russia or southern Europe,

13

<u>some challenges</u>.  **But I would say that our belief is gaining market share**, and we believe we have gained market share in 2011."

      • On July 24, 2012, Mr. Ersek stated that "In 2012, we remain **on track for revenue, earnings per share, and cash flow outlook we provided at the beginning of the year, despite economic challenges.**  In the second quarter, our consumer money transfer business, which represented over 80% of revenues, continued to deliver solid results. . .  There were some <u>very strong large markets</u> such as Germany, Saudi Arabia, and India that <u>helped offset</u> economic softness in Southern Europe and <u>expected challenges in Mexico</u> and Russia."

      • At that same event, Mr. Scheirman also made lengthy and detailed remarks.  Although SEB does not specifically mention Mr. Scheirman's remarks about Mexico, he stated "<u>Mexico revenue declined 7% and transactions decreased 5% in the quarter.</u>  As you recall, we anticipated revenue climbs[5] and share losses in Mexico this year, as we implement changes to our compliance related practices and business model."  SEB focuses on the subsequent remarks by Mr. Scheirman, who stated "<u>**Overall, we're on track to deliver our financial outlook, despite the expected macro and other challenges and higher compliance costs, as** our diversified portfolio</u> **allows us to produce stable results and general and deploy strong cash flow**."

These statements make clear that although Mexico (and other countries) were struggling, WU nevertheless believed that growth in other markets in their "diversified portfolio" would "offset" losses in those struggling markets, allowing WU to continue to experience global growth.

      As discussed below, by June 2012, WU might arguably have had a more concrete basis to gauge the potential magnitude of the loss of agents in Mexico.  In other words, by July 2012, WU officials should have been aware that the compliance problems in Mexico were something beyond simple "challenges" and were threatening to dramatically hurt the Mexico business.  In such circumstances, for WU's predictions of continued global growth to remain accurate, WU would have to have anticipated equally dramatic growth in other markets; put differently, if SEB could allege facts showing that, in June and July 2012, WU did not or could not reasonably anticipate explosive growth in markets outside of Mexico, it may have been misleading for it to

---

[5]     The context of the remaining remarks suggests that this is either a typographical or transcription error or an accidental misstatement by Mr. Scheirman.  It is likely that Mr. Scheirman meant to/did say "we anticipated revenue <u>declines</u> . . . ."

predict global growth knowing that the situation in Mexico, one of its larger markets, was potentially becoming catastrophic.

The current version of the Complaint does not recognize that WU's predictions of growth were global in nature, nor does it acknowledge the possibility that business growth outside of Mexico could offset business losses within Mexico. Thus, it does not currently suffice to demonstrate that WU's statements about global growth were misleading. However, it may be possible for SEB to assert facts showing that, in June and July 2012, WU both appreciated the potentially dramatic problems looming in Mexico and, simultaneously, could not point to other markets where reasonable forecasts of growth would be sufficient to offset potential losses in Mexico. With these additional allegations, SEB might be able to make a plausible assertion that WU's post-June 2012 predictions of global growth were misleading and made with sufficient scienter. Accordingly, the Court dismisses the securities fraud claims as currently pled with regard to WU's predictions of global growth without prejudice.

D.  Specific statements concerning the Mexico market

The remaining statements are those in which the Defendants specifically discuss the Mexico market and the nature and consequences of WU's compliance-related activities therein.

Before the Court turns to addressing the particular statements, it is necessary to further subdivide this category of statements into those occurring prior to June 2012 and those occurring during or after June 2012. SEB's claims here derive from two major factual contentions, one temporally located before June 2012 and one located in June 2012.

(i)  Pre-June 2012

A key provision in the Agreement required WU to retain the services of an independent Monitor who would oversee WU's compliance with legal and regulatory requirements. The

15

Monitor would devise an "Implementation Plan" that evaluated WU's existing compliance program and would make recommendations to further implement or improve that program. The Complaint appears to allege that WU first retained the Monitor on February 21, 2010, but that the Monitor did not begin issuing recommendations until "the middle of 2011." (Another portion of the Complaint appears to place this date at "mid-to-late 2011.")  According to a witness identified as CW1, a Vice President at WU, "things began hitting the fan" at this time, as WU realized that it would have to "migrate the systems of its Vigo and Orlandi Valuta agents" – that is, agents that were associated with two of WU's lower-cost brands that were particularly popular in Mexico and Latin America – "onto the Company's Norkom platform in order to comply with the recommendations."  This process was expected to "take a lot of time, effort, and expense to do."  CW1 "recalled that agents began leaving the company around mid-summer 2011," due to requirements that they update their own equipment to the Norkom platform and engage in other compliance measures, but the Complaint does not attempt to quantify the scope of agent losses at this time, either numerically or descriptively.  At some point in time, probably summer 2011, WU reassigned Victoria Lopez-Negrete, then a Senior Vice President of the WU's North American unit, to what the Complaint calls a "rescue mission": the task of developing and implementing "strategies to retain the Company's agents in Mexico."

Thus, by SEB's allegations, the factual scenario that informed the Defendants' statements prior to June 2012 consisted of: (i) concerns about the difficulties of migrating agents handling WU's low-priced brands onto a new, more secure technology platform; (ii) an unspecified number of agents leaving or having already left the network; and (iii) the fact that WU had reassigned Ms. Lopez-Negrete specifically to address the previous two points.  With these facts

in mind, the Court turns to the Mexico-related comments made by the Defendants at this time

(again, bolded text is that emphasized by SEB in its Complaint):

      • On February 7, 2012, on a conference call to address WU's 2011 financial results and its 2012 financial outlook, a Barclay's analyst stated ". . . last question on Mexico.  Can you give a lot more color on what exactly you are doing there?  I just maybe, and I know you mentioned before, how you expect a little bit of slower trend, but maybe give us a little more explanation?"  Mr. Ersek responded "If you look at our Mexico business, it's **a little bit affected by ongoing compliance procedures**, which we are changing, especially from southwest of the border.  As you recall, we had to agree to 2009, to work with an independent monitor on our compliance activities.  And that we see that some of the activity has been impacted our business.  And we also our looking at 2012, of our model, our practices in Mexico.  **We are in the process of reviewing some agent agreement**, and changing our operating model. . . . In Mexico, we are going to upgrade our compliance-related changes.  We are going to be more – we really want to be the industry standard, and the highest standard of industry.  I think we really want to be the highest there.  So I believe that **we have the right approach there**.  And just to put things in perspective, as you know, none of our business, Mexico is not larger than 6% in 2011 of our business, right, so—"

      • On April 24, 2012, during a conference call discussing WU's first quarter 2012 earnings, an analyst asked "Can you just quickly update us on the compliance situation in Mexico?  How is that progressing and by when do you expect to be in some compliance?"  Mr. Ersek responded ". . . **we have been working with the appointed external monitor very close to determine and appreciate changes, which we have outlined in our agreement and improvements about anti-money laundering oversight all along the border**.  I think we did do some changes last year on the Vigo and Orlandi Valuta brands and also on our brands ID threshold changes, which have impacted our high principal transfers, which we still see it.  Currently, we are also investing on the new technology changes and we have other many projects on the way.  We believe that these changes have affected our principal and markets share in 2012, but we also believe that these changes are needed.  **These changes are happening and we are going to be, as an industry leader, we're implementing the changes and that will also impact all the industry long-term**."

      • Earlier in that same call, Mr. Scheirman gave a lengthy briefing, during which he stated "Turning to North America, the region's revenues increased 5% compared to 2% last quarter. . . Mexico improved from last quarter with both revenue and transactions increasing 3% in the quarter.  As we mentioned in February, we are still determining and implementing changes to our compliance-related practices in Mexico.  Although we still expect to see **some negative impact on the Vigo and Orlandi Valuta brands** as we evolve our business model and compliance-related practices throughout the year, our Western Union brand is performing well."

      • On May 9, 2012, at an Investor Day presentation, Ms. Lopez-Negrete reported on WU's activities in North America:  "And growing Mexico for the better, we've been in Mexico over 150 years.  Mexico is the perfect example about how Western Union evolves with its agents and

evolves with the environment.  Mexico is the 12th largest country in terms of population, with 111 million people.  Fifty percent of those people are under the age of 25.  It is estimated that 28% is in informal activity of all the economic activity.  There's a huge opportunity.  And the market is evolving extremely rapidly.  With Electra and Banamex, we've had a longstanding relationship and we're evolving that relationship to be able to expand our services and channels in Mexico.  Mexico has traditionally been a receive country.  We're growing our outbound Mexico to the world business and you will be hearing much more in terms of how we're diversifying that country – that business to drive our Western Union brand equity. . .   And we're investing in Mexico to accelerate our growth."

(ii).  <u>Post-June 2012</u>

The Complaint recites certain additional factual developments that began occurring at some point in June 2012.  According to SEB, in June 2012, WU hired a group of 30-35 additional employees to assist it in vetting a backlog of 50,000-60,000 agents operating in the southwest border area.[6]  This task involved reviewing license applications, conducting background checks, communicating with agents when applications are incomplete, and so on.  These tasks were particularly time-consuming (and often required Spanish-language skills).  As a result, according to the Complaint, the employees were typically able to complete only 3-4 agent applications per day.[7]  SEB relies on allegations from a witness identified as CW2, who worked as one of these employees.  CW2 reported that, in her experience, only about 20% of the agent applications she reviewed were found to be in sufficient compliance.  Of the non-compliant or incomplete applications, CW2 estimated that only an additional 15% could ever be brought into compliance.  In other words, CW2 estimates that roughly two-thirds of the 50,000-60,000 agents in the backlog could not be brought into compliance at all. The employees' efforts and progress in vetting the backlog of agents were set forth in weekly documents called "Pipeline Reports."

---

[6]     The Complaint alleges that WU hired an additional 25 employees at some unspecified time in September 2012 to assist with this task.  That later hiring does not materially affect the analysis herein.

[7]     A group of 35 employees each completing 4 applications per day, 5 days per week, would complete 700 applications per week.

SEB states that CW2 and the other employees would have weekly meetings with their supervisors to discuss the Pipeline Reports.  CW2 states that she "was informed that Western Union executives, including Defendants Ersek and Scheirman, received the Pipeline Reports."

These allegations form what is perhaps the central theme of SEB's allegations: that beginning in June 2012, the Defendants were aware (or, at least, were becoming aware) that some two-thirds of their agent network in Mexico could not be brought into compliance with the terms required by the Agreement.  The loss of that many agents would likely result in large declines in revenues in Mexico and require WU to take aggressive and expensive steps to court new agents and/or retain existing ones.  SEB alleges that the Defendants made the following statements with these facts in mind:

• During a July 24, 2012 conference call concerning WU's second quarter earnings, a William Blair analyst asked for "a little more color maybe on North America, Mexico, and some of the troubled regions on some of the trends that you saw there?  I think you outperformed what you thought in the first quarter; you certainly had pointed towards trouble in Mexico in the second quarter.  Could you go over, again, the growth rates in North America and Mexico and what you expect over the next several quarters?"  Mr. Ersek responded "I think the Mexico business, North America outbound to Mexico business has been meeting our expectations.  **We were expecting some slow down** due to our, some changes we implemented in the southwest border area.  Don't forget that it's about 25% of our revenue is from the U.S. outbound to Mexico is coming from the southwest border area.  25%, so it has slowed down.  We put some higher restrictions there, we put some higher requirements for customers and I think it impacted short term our business.  **Long term we believe that we're going to be upgrading and we're going to set some industry standards here**.  That has been some Mexico."  Mr. Scheirman added "just to reiterate with Mexico, it's really what we expected to have some challenges in 2012.  But as we work through evolving the business model and so forth, **we believe that will put us in a much stronger position on a long-term basis with Mexico**."

• During that same call, a Credit Suisse analyst asked for "a little more color in terms of your turnaround strategies for Mexico and Russia."  Mr. Ersek responded "I think 2012 will be still both countries **a little bit challenging until we turn around**.  In think we're investing on the Mexico and there are two different issues here.  In Mexico, it's more about upgrading our compliance in the southwest border and other areas and setting the industry standards that long-term we are meeting the standard.  The analyst responded "you think the compliance issues are the main problem in Mexico," and Mr. Ersek responded "I think, in Mexico, one thing also happened is that we – as the exclusivity ended, we are starting to negotiate with new agents,

potential agents.  As we speak, the team is there in Mexico and I think we are **actively pursuing new agents there in Mexico** that will help also to grow our business long-term in Mexico."

The Court must first consider whether any of the statements discussed above constitute misrepresentations.  It is undisputed that none of the statements are literally false.  Instead, SEB alleges that the statements contain material omissions, in that although the Defendants might have warned investors of various "challenges" and "impacts" that the compliance efforts would have on revenues in Mexico, it failed to warn them of the <u>degree</u> to which those efforts would dissolve WU's agent network.   A statement that omits information that is <u>material</u> is a misrepresentation under Section 10(b); by extension, information is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-23 (1988).

However, it is axiomatic that a defendant is only required to disclose facts that are known to him or her.   Knowledge is addressed in the scienter element, which requires a plaintiff to allege facts showing "the defendant knew of the potentially material fact" and "knew that failure to reveal the potentially material fact would likely mislead investors."  *In re Zagg, Inc. Securities Litigation*, ___ F.3d ___, 2015 WL 4901893 (10th Cir. Aug. 18, 2015), *citing Weinstein v. McClendon*, 757 F.3d 1110, 1113 910th Cir. 2014).

Here, the Court finds that, for time periods prior to June 2012, SEB has failed to adequately allege either a material omission or the requisite scienter on the part of any Defendant.  The Complaint alleges that "agents began leaving the Company around mid-summer 2011."  This statement is pregnant with ambiguity in two respects: the number of agents doing the leaving could be a trickle or a torrent, and "began leaving" is a verb tense that describes an action occurring over an indefinite period of time.  If the true facts are that hundreds or

thousands of agents dropped out of WU's Mexico network between mid-2011 and February 7 or May 9, 2012, the Court might be inclined to find that a reasonable investor would find that information more significant than mere generalized assertions of "changes" and "negative impacts" affecting the agent network, making such information material.  On the other hand, if the scale of defections between mid-2011 and mid-2012 was only a few dozen agents or a mere handful, or if the flow rate was minimal at the beginning of the time period and increased significantly close to the end, the Court might be inclined to find such facts to be immaterial in light of the general statements made by the Defendants.  The Complaint is simply too vague to permit an inference to be drawn one way or the other.  Although SEB alleges that the changes were important enough to cause WU to reassign Ms. Lopez-Negrete to undertake a "rescue mission" (it is not clear from the Complaint whether this is Ms. Lopez-Negrete's wording, the impression of CW1, or simply argument by SEB) , that characterization is not particularly meaningful, insofar as it appears to be undisputed that Herculean efforts were going to be necessary to address the Monitor's recommendations in such a large agent network in any event.  Nor does CW1's colorful description of things "hitting the fan" and it being "not a happy time" at WU after the Monitor issued recommendations in mid-2011 provide any meaningful guidance about the number of agent defections that were occurring and when.  Without providing some means of ascertaining the significance of the number of agent defections occurring between 2011 and June 2012, SEB has not carried its burden of alleging facts sufficient to demonstrate a plausible claim.  (Once again, this defect may be curable by amendment, however.)

The analysis is somewhat different after June 2012.  At that point in time, WU had ascertained a need to process a backlog of checks on some 50,000 agents and retained additional

employees, like CW2, to do so.[8]  The task was a slow one: CW2 was able to process no more

than about 20 agents per week.[9]  CW2 ultimately concluded that only 20% of the agents could be

cleared after an initial review of their application, and an additional 12% (15% of the remaining

80%) could be cleared with additional effort.  The magic of statistical sampling allows for

reaching highly-valid estimates of the overall composition of a large group from a fairly small

sample size.  WU could have formed a very reliable estimate on the success rate for clearing the

50,000 agents based on fewer than 700 initial trials.  Even assuming the employees started in late

June 2012, processed only 350 agents per week (*i.e.* half the rate estimated by CW2), and

reported that data in Pipeline Reports on a weekly basis, WU still would have had a meaningful

estimate of the proportion of the 50,000 agents that could meet the compliance criteria prior to

the July 24, 2012 conference call.[10]

　　　　The William Blair analyst on the July 24, 2012 conference call inquired about "the

growth rates in North America and Mexico and what you expect over the next several quarters."

Mr. Ersek responded that WU expected "some slow down," and Mr. Scheirman expected "some

challenges" there.  But the Court agrees with SEB that a reasonable investor would consider the

potential loss of tens of thousands of agents from the network to be materially more significant

---

[8]　　It is not apparent from the Complaint whether and to what extent WU had been able to perform this task prior to hiring the additional employees.

[9]　　The Complaint appears to suggest that CW2 might have been faster than most of her co-workers in vetting the applications.  The Complaint states that "many of [the agent applications] were in Spanish, whereas few, if any, [of the additional employees] working on the compliance review spoke Spanish."

[10]　　Explaining that "timing matters are critical here," the Defendants' response to SEB's Objections argues that the Court should draw a variety of inferences unfavorable to SEB from ambiguities in the Complaint: *e.g.* that because CW2 "conspicuously fails to state *when* [the agent disqualification rate] became known," the Court should infer that it did not do so prior to July 24, 2012.  This is, of course, contrary to the standard that the Court applies on a motion to dismiss.  In any event, the Court is confident that robust discovery will grant both sides the opportunity to address the true facts more clearly at the summary judgment stage.

than vague references to "some challenges." WU and the Magistrate Judge focus on the fact that

the Complaint does not indicate when a decision to terminate the 7,000 agents was made prior to

any of WU's statements, but this Court finds that WU's duty to speak does not depend on when

it actually decided to terminate the agents.  As the Supreme Court made clear in Basic, the

materiality of a contingent event – such as the potential termination of a large number of agents –

is evaluated based on balancing the probability that the event will occur against the anticipated

magnitude of the event.  485 U.S. at 238.  Here, taking CW2's allegations as true, WU was

aware of the probability that some two-thirds of its agent network in Mexico would be unable to

pass the new compliance requirements.  Even assuming WU had the ability to mitigate that total

somewhat (and apparently it did, as only 7,000 agents were terminated instead of the expected

33,000), the potential effects of a mass termination on WU's Mexico business, and,

concomitantly, on its overall revenues, is significant enough to conclude that the risk was a

material fact that should have been disclosed.  Moreover, as the Magistrate Judge found, the

Complaint sufficiently alleges facts to conclude that both Mr. Ersek and Mr. Scheirman had the

requisite scienter.  The Pipeline Reports would have quickly revealed what CW2 states: that only

32% of WU's Mexico agents would ever be able to pass the compliance checks.

Accordingly, the Court finds that SEB has pled sufficient facts to state a claim for

securities fraud with regard to Mr. Ersek and Mr. Scheirman's failure to disclose the troubling

extent to which agents were failing compliance checks as of July 24, 2012.[11]

## CONCLUSION

---

[11]   Because the Complaint fails to adequately allege any statement of this type attributable to
Mr. Stockdale, the Court finds it appropriate to grant the motion to dismiss the direct claim
asserted against him.  Moreover, the Court finds that SEB has failed to adequately allege facts
showing that Mr. Stockdale had the ability to control Mr. Ersek or Mr. Scheirman, and thus,
dismisses the control person liability claim against him as well.

For the foregoing reasons, the Court **SUSTAINS IN PART** and **OVERRULES IN PART** SEB's Objections (**# 85**).  The Court **ADOPTS IN PART** the Recommendation (**# 85**) and **GRANTS IN PART** and **DENIES IN PART** the Defendants' Motion to Dismiss (**# 79**).  All claims against Mr. Stockdale are **DISMISSED**, and the caption of the case is deemed amended to omit him.  The motion is **DENIED** as to the remaining Defendants as set forth herein.

Dated this 29th day of September, 2015.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge

# APPENDIX

**A.  Statements regarding compliance activities as a competitive advantage**:

February 7, 2012

• Mr. Ersek stated "**We have a strong foundation** with our brand, our global network, our consumer relationships, **our regulatory and compliance capabilities**, and our range of send-and-deliver options."

• During a question-and-answer session, an analyst from Deutsche Bank stated "It sounds like compliance and regulatory challenges are hampering the growth rate in several countries, Italy, Mexico, China," and asked "do you worry that could spread to other nations?"  Mr. Ersek responded ". . . I think [WU] . . . **has the focus, and [compliance] is a high priority in our environment.  I think we are really setting the industry standard**, and my aim is . . . with our anti-money laundering activities to setup, **are a very high priority**, that is the first thing.  I would say that the regulatory environment in this business has been always challenging. . . . [It] has been always a challenge to enter some markets, because of the regulatory environment.  **I feel quite confident that we have the right structure to meet the regulatory environment needs**."

May 9, 2012

• In introductory remarks, Mr. Ersek took an opportunity to "remind [listeners] about our strengths of the Company.  These strengths separate us from the competitors – **I believe they are a huge competitive advantage** – our global network, our strong brand, our global organization and resources, and **our regulatory and anti-money laundering capabilities**.  There are not many companies worldwide which could show these capabilities to you."  Mr. Ersek proceeded to address each of these areas in some detail.  With regard to the regulatory and compliance capabilities, he stated "**Our fourth competitive advantage is our global anti-money laundering regulatory capabilities.**  The regulations around our business are really highly complex.  And we have regulatory complexity in all our markets.  We have to comply with various acts and interdiction lists around the world, as well as maintain a very active risk management system to detect and deter potential money laundering activities.  It sounds complex and it is indeed complex, but we **see that as a competitive advantage as we comply with various acts and interdiction lists around the world in 200 countries**.  And the regulatory environment is changing constantly in different parts of the world.  Let me give you an example.  A recent example here in the U.S. actually with money transfer providers now have to adopt to conform with the rules of Dodd-Frank Act.  Implementation and operation of the new disclosure requirements under Dodd-Frank is really complex.  And, although there are going to be some costs for to implement that, **we view as a competitive advantage.  We have the technology and resources available** to meet the installation needs across our agents that are based in the U.S. while others may – don't have the resources and technology. . . ."

• Later, Mr. Ersek continued his remarks:  "So, many investors always ask me, why you, Hikmet – **why you at Western Union think that you can grow this business, and why you're**

**going to be successful** rather than any technology company.  Let me spend a few minutes explaining this one.  First, as you recall, it's important to remember Western Union is today market leader in money transfer business.  We have built an incredible network over the years now with 500,000 retail locations in 200 countries and territories.  Our brand is well-known and trusted around the globe.  **We have the regulatory and anti-money laundering capabilities to operate in all countries**. . . ."

• Later in his remarks, Mr. Scheirman stated "And I do want to mention Dodd-Frank this morning, that as we begin to implement that in 2012 we believe we'll incur some one-time incremental costs to implement Dodd-Frank and some ongoing costs too.  But as Hikmet mentioned, **we believe our compliance capabilities on a long-term basis are very much of a competitive advantage** as we move forward.  And so, we currently have a team evaluating how to operationalize Dodd-Frank.  We have to, if you will, enable 60,000 locations in a short amount of time with training, technology, agent implementation, and so forth.  And so, as we get to the second quarter earnings release we'll share more with you on what those costs might look like."

• During his closing remarks, Mr. Ersek stated "We are changing the company.  We are taking to the next level.  We put the fundamentals and the beauty of that is that we are building on our existing assets.  We have the global brand awareness.  We have the global network.  **We have the regulatory environment.**  It scares to death the competitors to enter this market, I'll openly say it.  **But this is good.  It's good that this business is complex because we have the competencies.**  We are very focused as a team with our agents to take this company to the next level.  With growth, the margin expansion will come.  Our investments is in the ventures or is in the sales force to grow the business will pay back.  I'm very confident about that.  We do have challenges, economic challenges globally, parts of worldwide – parts of Europe still have challenges, parts of other, unemployment rate doesn't help.  But this will change that will help also to grow our business.  The regulatory environment challenges are here.  They are constant.  They're happening but it's part of our business.  **However, I believe that we have the right business plan, right model to grow this business short term and long term**."

June 12, 2012

• In Mr. Ersek's opening remarks, he addressed how a "strength of Western Union is the global organization [of] agent resources," touting WU's 500,000 locations.  He continued on, "**One of our very strong competitive advantage is our regulatory environment, our regulatory and anti-money-laundering competency capabilities.**  It scares to death the competition to enter this market, the regulatory environment.  And I always say – I know it's sometimes tough, but I always say it's good that the regulatory environment, that we as Western Union have these capabilities to serve the customers and give the trust to the customers they believe at Western Union.  And we spend about $ 60 million yearly on the anti-money-laundering activities.  We have about 600 employees really looking after the regulatory environment on the day to day.  And don't forget, we are not only regulated in the U.S. or in the U.K.; we are regulated in 200 countries.  We do have different regulatory environment in 200 countries and Western Union has the competency to serve the customers.  And it's not easy to get a money transfer license in Tajikistan.  It's not easy to have a money license in Gabon and

Brazil or other states I'm talking about. So it's a competitive advantage for Western Union and we are very proud of that."

• During a question-and-answer session, an analyst asked "why wouldn't I just send money cross-border on Pay Pal? What disintermediation risks do you most fear? And why is somebody wrong to suggest that something like a Pay Pal or an iTunes could end up being a significant risk for you, or the mobile communications companies?" Mr. Ersek responded " . . . I think first of all you have to build the fundamentals we have done for many, many years. We be now in, as I mentioned, in 500,000 locations in 200 countries – somebody has to do that. It's not easy to build that. **You have to get the regulatory environment – somebody has to do that. It's not easy to do that. You have to go down to money laundering – somebody has to do that.** You have to settle in 135 currencies. How do you settle in 135 currencies in minutes? Somebody has to do that. So that has been definitely something we are very proud. We built that. And has to be really done by someone else."

July 24, 2012

• A J.P. Morgan analyst asked "The compliance costs moving up, do you think this will eventually apply to some of your smaller peers as well and perhaps, ease some of the competition, especially in pricing, going forward?" Mr. Ersek responded "it's upgrading our compliance. **As you know, we're very focused here and we are very serious. It's a competitive advantage, long-term. I think we are investing heavily here to be, really I think as an industry leader, we are setting the tone here and I think we are very focused here and I see that as definitely a competitive advantage."**

October 16, 2012

• Defendant Stockdale gave a speech at the University of Denver, stating: "**What makes us unique that allow us to have these relationships and really our core competencies to reach consumers in 200 countries and territories is really these four pillars of our strategy. . . . Three is the regulatory and AML [anti-money laundering] capabilities of the Company in almost every jurisdiction in the world. . . What really is more difficult is to make sure that you're complying with all the laws around the world. And we spend a ton of money. And we have over 600 people on an ongoing basis monitoring the system on an ongoing basis. And you have to do that. One of the core capabilities is being able to work with governments** no only the U.S. government but the governments of Vietnam, the governments of India, the governments of China **to make sure that this cash movement which is in the billions of dollars is all being monitored on an ongoing basis.**" He then repeated WU's belief that "I'll tell you that we hope that over time [Dodd-Frank] becomes a **competitive advantage for us as – as all regulation does because if you're in front and you have the resources to implement and do it well.**"

**B. Statements forecasting pricing investment**

February 7, 2012

• A Goldman Sachs analyst asked about "the strategy that you laid out back in 2010." The analyst stated "[A]s we go into 2010, it feels like you have to do more in the way of incremental investments to sort of keep pace.  Is that the economy that's driving some of the requirements for incremental investments?  Is there more competition?  So if you could just help us bridge the gap between what you sort of laid out as your investment strategy in 2010, versus where you are now in 2012, where is the change on the margin, in the sense that you actually have to go out and invest more to stay competitive?"  Mr. Ersek gave a lengthy response addressing various areas of business before concluding with a reference to "the consumers," which the Court understands to be a reference to WU's C2C business sector.  As to that issue, Mr. Ersek stated, somewhat cryptically, "That needs some investments, to[o] – around the consumers, and that is what we are really doing on that part.  I wouldn't say that's a big pricing invest – a big pricing challenge in globally, **as you recall our pricing investment was around 1% 2011.  And we assume that it will be 1% to 2% in 2012.**"

March 13, 2012

• Talk turned to how at least one large agent in Mexico, Electra, had ended its exclusivity arrangement with WU and was working with both WU and its competitors.  After several questions and answers about the issue of agent exclusivity, an analyst asked "Are you concerned that like Coke, Pepsi . . . it's more pricing competition when you're sharing shelf space?"  Mr. Scheirman responded "we've seen over the years, go back five or 10 years, a lot of competition, many competitors in the marketplace.  And today we only stand at about an 18% share.  We do believe our brand, our agent network of 485,000 locations **are really competitive strengths for us, along with our compliance programs**.  But specifically, when it gets to pricing what we've seen there, we manage our business in roughly 16,000 corridors, and anytime we adjust pricing it's really an eye to gain market share and to do the things that, if you will, drive the strongest revenue and profit growth on a long-term basis.  And a few data points, if you look at 2011 our prices were down about 1%.  If you fast forward that to the outlook we gave in February, about a month ago as part of our earnings conference, **we see pricing being down 1% to 2%,** so similar to what we saw in 2011.  But clearly what we feel with the combination of building our brand, evolving our product set, marketing through our loyalty program, and then some pricing adjustments here and there, **we can continue to gain share as we move forward**."

May 9, 2012

• A Sun Trust analyst stated "I didn't hear any discussion today even a little about pricing.  And it strikes me that – a couple of things, pricing seems to have gotten a little more stable in the last year or two.  You've got thousands of global corridors across which pricing pressure is very different.  So how sophisticated are your pricing models?  How much of an opportunity you looking at to arbitrage across all these corridors and maybe view that more as a revenue growth opportunity rather than the headwind it's been for the last several years?"  An "unidentified company representative" responded ". . . you were led to believe over the years that we were going to do 1% to 3% usually in a decline.  If you saw the last couple of years that's been reversed.  And this year it'll probably be in the **1%** range so that's kind of our guidance .  What we're doing on an ongoing basis, we're raising and lowering prices (inaudible) and we've got numerous initiatives around the globe that you're not hearing about on a day to day basis.

And we do have models and sensitivity models on how to play with the fee and the FX.  And we're constantly trading, I mean, Mother's Day is coming up tomorrow.  Right?  It's a big, big time for our Mexico business.  Those FX rates are going up and don on a – on a daily basis based on market volatility.  So we're playing with pricing and we've actually gotten over the last couple of years – few years, very sophisticated with sensitivity models."

July 24, 2012

• An analyst stated: "I want to ask about pricing.  It's still only a modest negative.  it seems like it's lower than historical trends, except for sporadic pricing initiatives.  What's a good price trend line for the next 12 months?  Negative 1 to negative 2?  or will it get back to a historical negative 2 to 3?"  Mr. Ersek responded "I think generally as we are looking corridor by corridor on our pricing, **we are going, in 2012, we are going to be around 1%.  And 1% to 2%, that will be the next forecast**.  Given the environment, we are looking at price action corridor by corridor, but I would say 1% to 2% around that will be in 2012, probably."

**C.  Statements about growth generally**

March 13, 2012

• An analyst stated "Western Union has become one of the cheapest stocks in the processing space, my coverage universe, and I've covered it for a long time.  There's always been this, kind of this dinosaur, bear case out there.  Can you say here that you're confident that the core C2C business, the business model is intact and you can grown the core C2C business over time?"  Mr. Ersek responded "Yes, Jim, **we are very confident in the core C2C business model.**  And it might be helpful to share a little bit of our strategies and where we're heading in this area," and proceeded to point out that WU had grown in that market every year for the last 10 years.  He continued, "And today our share stands at about 18%.  **And we believe we have opportunities to continue to grow that share."**  He went on to state "One thing to keep in mind about the core C2C business is that in many countries around the globe, whether it's in the continent of Africa, Asia, Latin America, very much of a cash based society . . . And so with a network of 485,000 locations that resonates very well with cash in, cash out as we move money."  Mr. Ersek proceeded to detail particular areas that he saw as ripe for growth, including Asia and Canada.

• An analyst followed up with the question "So not to put you on the spot, but do you think it's a 5% growth over a long period of time, is it – can you grow faster, can you accelerate the growth?"  Mr. Scheirman responded "Clearly, our objective is we want to grow faster, gain market share at an accelerated pace, although we don't give long-term guidance for our objectives. But what I would point you towards, Jim, is I-80, if you just look at near term, 2011, 2012, they estimate the cross-border remittance market is growing in that 5% range.  We clearly feel like **there's opportunities to continue to gain share at an increased pace as we move forward**.  So again, no long-term objectives as far as growth rates, but **we feel like very much the growth story is intact in the core business**."

May 9, 2012

• Mr. Ersek concluded his introductory remarks by stating: "**We believe the opportunity to accelerate growth over the next few years are strong.** Despite the economic challenges in some parts of the world which exist today, **we believe we have the right growth model. We believe in our core money transfer business and are taking steps to drive a higher growth rates than we have seen recently.** We can compliment with this – with higher growth with business solutions and very high growth from our smaller early stage businesses such as digital and stored value."

• After Mr. Ersek's opening remarks, Mr. Scheirman made some remarks. He stated "And as Hikmet mentioned, were keenly focused on three growth areas. And **those growth areas very much leverage** our strength, our brand, our distribution network, **our compliance and regulatory capabilities** and our organization and our infrastructure. **And we believe by leveraging these strengths and focusing on our strategies and our strategic roadmaps and being very focused on execution, we can deliver strong returns in each of these areas over the years to come.** Let me first star with the total shareholder return model and give you an outline and then jump into some more details. It first starts with revenue growth. And as Hikmet mentioned, we believe we've got opportunities over the next several years to accelerate the pace of revenue growth as we move forward. **Every day we think about how do we grow the top line, how do we gain market share.**"

July 24, 2012

• During the question-and-answer period, an analyst from Janney Capital Markets stated "given the macro headwinds, the slowdown in global trade and other challenges that are impacting the core consumer business, you still kept your full-year revenue guidance unchanged. I'm wondering if there were some offsets that you can call out as far as other areas of the business that are exceeding expectations or maybe just add some other comments around why you kept the revenue guidance unchanged given those factors?" Mr. Scheirman responded "Overall, if you look at the C2C business, it's 80% of our revenues and that's had good, solid, consistent performance on a year-to-date basis. You're seeing growth very strong there at the 4% range, so we're at the higher end, just on a year-to-date basis." He mentioned other business sectors that were performing well, and concluded ". . . But **overall, the core C2C business is strong, it's solid.** We had consistent margins with a year ago and so **we feel good about where that business is at and where we're heading.**"

• A Citigroup analyst asked about "intra-corridor trends for C2C," explaining how "the only geo[graphic corridor] with negative transaction growth was Europe, but just for Europe as well as other geos how did transactions trend each month in the quarter . . .?" Mr. Scheirman responded "I'd say the broad headline is **we're confident with the guidance that we've provided, the 2012 outlook we've provided today for revenue growth, margins, and EPS. We're confident in the guidance that we've provided.**" He repeated WU's policy of not commenting on matters occurring within a quarter, but stated "the headline I would give you, Ashwin, is that we're comfortable with the guidance we provided today." The analyst then observed that "the sequential Q2 is not as good as Q1, which is not a surprise to anyone. But is it continuing to get worse or has it stabilized? Your guidance would seem to imply it's stabilized."

Mr. Scheirman responded "Again, I would probably go back to **we're confident in our full-year outlook.** If you compare the first quarter and second quarter, Europe and the Americas, North America had some slighter softness, but if you look at Asia-Pacific, Latin America, the Middle East and Africa, each of those markets had growth rates that were very comparable to the first quarter, so they were strong. . . That's the beauty of business. We're 200 countries, 16,000 corridors; it's a portfolio approach. From quarter to quarter, month to month, you might have some puts and takes. But overall within the 200 countries, we feel like we're driving in the right direction and doing the right things."